Nos. 37,941 and 37,984

SOUTHWESTERN BELL TELEPHONE COMPANY, a Corporation, *Appellee*, v. THE STATE CORPORATION COMMISSION OF THE STATE OF KANSAS, JEFF A. ROBERTSON, Chairman and Commissioner, DE-WITT M. STILES, Commissioner, and CHARLES M. WARREN, Commissioner, as Members of the State Corporation Commission of the State of Kansas, and Their Respective Successors in Office, *Appellants.*

(219 P. 2d 361)

Opinion filed June 10, 1950.

*Louis R. Gates,* of Kansas City, *Howard T. Fleeson,* of Wichita, and *Douglas Gleason,* of Ottawa, all argued the cause, and were on the briefs for the .appellants.

*W. F. Lilleston,* of Wichita, *Robert L. Webb,* of Topeka, and *Lloyd S. Miller,* of Kansas City, Missouri, all argued the cause, and were on the briefs for the appellee.

The opinion of the court was delivered by

PARKER, J.:   These two appeals, consolidated after they reached this court, have to do with a rate proceeding commenced before the State Corporation Commission of Kansas and require a review of orders of the district court of Shawnee county entered in a statutory review proceeding instituted in that court, pursuant to authorization of the statute (G. S. 1935, 66-118a to 66-118o, inclusive), by the Southwestern Bell Telephone Company.   The all decisive issue in each requires judicial construction of G. S. 1935, ch. 66, art. 14, dealing with holding companies and commonly referred to as the affiliate statute.

In order to insure a proper understanding of the issue involved it will be necessary to refer, as briefly as possible, to what took place in the tribunals having jurisdiction over the matters here in controversy from the time the proceeding was first instituted down to rendition of the judgment in district court from which the appeals were taken.   This, it might as well be noted at this point, cannot be done with any considerable degree of brevity when faced by a record consisting of: Appellants' abstract of 1,012 pages and appellee's counter abstract of 749 pages, each of which describes at some length or sets forth *in toto* 185 complicated exhibits prepared by certified public accountants; appellants' brief of 124 pages; appellee's brief of 146 pages; appellants' reply brief of 67 pages, and appellee's response to appellants' reply brief containing 27 pages. It should likewise be stated that in an effort to shorten the opinion as much as the record permits we shall, throughout its course, refer to the appellants as the Commission and the appellee as Southwestern.   For the same reason, when later it becomes necessary to mention two additional corporations, namely, Western Electric Company and the American Telephone & Telegraph Company, we will refer to the one first named as Western and to the second as American.

On September 30, 1947, Southwestern filed an application with the Commission for permission to put into effect in Kansas new

schedules of rates for its 143 exchange properties and for its intrastate toll property under the jurisdiction of the Commission. The proceeding was instituted under G. S. 1935, 66-117 which provides, among other things, that no change shall be made in any rate, toll. or schedule of charges by a public utility without the consent of the Commission. The application was given docket No. 34,333-U. It sets forth many reasons for institution of the rate proceeding and includes allegations to the effect that under existing rates Southwestern was not able to earn a sufficient amount of money in Kansas to pay the actual costs of furnishing telephone service in the State and that the rate schedules therein proposed would produce $3,279,-000 in gross additional revenue.

October 3, 1947, in conformity with the provisions of G. S. 1935, 66-110, making it the duty of the Commission, either upon complaint or upon its own initiative, to investigate public utility rates and providing that if after hearing and investigation they are unjust it shall have the power to fix and order such substituted rates as shall be just and reasonable, the Commission assigned the application for hearing on January 5, 1948. Thereafter Southwestern and the Commission entered into a stipulation which authorized and permitted the latter, on October 9, 1947, to issue an order wherein it found: that in order to determine the issues raised by the application and to carry out the duties imposed upon it by law it was necessary for it to investigate all of the operations of Southwestern, its affiliates, subsidiaries and other members or segments of the Bell system which affect the rates and charges now or to be made applicable within the state, and to appraise the property wherever located which affects the determination or establishment of just or reasonable charges within the exchanges covered by Southwestern's application; that the costs and expenses necessarily incurred in the making of or reasonably attributable to such investigation and appraisal should be assessed against Southwestern; that in making such investigation, appraisal and all proceedings involved, the Commission should exercise the power and authority conferred upon it by G. S. 1935, chapter 66; and directed that the investigation be initiated and carried out for the purpose and in the manner set forth in such findings.

The application came on for hearing in due course. Evidence was introduced in support thereof by Southwestern between January 5 and 10, 1948. This consisted of both oral and deposition testimony. After Southwestern had adduced its evidence and rested its case

counsel for the Commission filed a motion to dismiss the application. This motion is quite lengthy but it so clearly portrays their position with respect to how the all important statute should be interpreted that we deem it worth-while to set forth the substance of the allegations to be found in its respective paragraphs. Summarized they read:

1. Construed in its most favorable light the evidence adduced by Southwestern wholly fails to establish it is entitled to the relief it seeks.

2. The Commission is a creature of the legislature having the power and duty of performing the legislative function of fixing rates. It is required to observe and adhere to legislative directions pertaining to this function and its authority extends no further.

3. The evidence adduced by Southwestern establishes beyond question that a substantial portion of its investment and plant consists of charges made for materials and commodities furnished and purchased from, and for services rendered by Western and by American, corporations with which it is affiliated.

4. The evidence shows a substantial portion of the operating expenses of Southwestern for the current year and for previous years and contemplated expenses for the coming years are composed of charges made by Western and by American to Southwestern for services rendered and materials and commodities furnished and sold to Southwestern by such affiliated companies.

5. Section 3 of Chapter 239 of the session laws of Kansas for 1931 (G. S. 1935, 66-1403) reads:

"Sec. 3. In ascertaining the reasonableness of a rate or charge to be made by a public utility, no charge for services rendered by a holding or affiliated company, or charge for materials or commodity furnished or purchased from a holding or affiliated company, shall be given consideration in determining a reasonable rate or charge unless there be a showing made by the utility affected by the rate or charge as to the actual cost to the holding or affiliated company furnishing such service and material or commodity. Such showing shall consist of an itemized statement furnished by the utility setting out in detail the various items, cost for services rendered and material or commodity furnished by the holding or affiliated company."

6. Under this statute no charge for services rendered or for material or commodities furnished by such affiliated companies may be given consideration by the Commission in its determination of a reasonable rate or charge to be made by Southwestern unless there be a showing made by Southwestern as to the actual cost to Western

and to American of such services, materials and commodities. No showing has been made.

7. With respect to Western the only showing attempted by Southwestern has been that the profits made by Western as a result of charges for services rendered and materials and commodities furnished and sold to Southwestern have been reasonable.

8. With respect to American the only showing attempted is that services were rendered and materials and commodities furnished by American to Southwestern which were of value to the utility. In addition Southwestern has attempted to show the entire operating expenses of American including its long lines department. Southwestern made no attempt to show the individual costs of the services rendered or the materials or commodities allegedly furnished thus completely ignoring the mandate of the last sentence of the statute heretofore quoted.

9. It is the belief of counsel for the Commission that this is the appropriate time to call attention to provisions of the statute outlining the duties of the Commission to everyone concerned. It is in the interest of subscribers, Southwestern and the general public, that the expensive proceedings in investigations be avoided if possible. Such proceedings will be unnecessary at this time since the requirements of the statute have not been met by Southwestern.

Further indication as to the actual theory upon which the motion to dismiss was based is to be found in a statement made by one of the Commission's counsel who, in the course of argument while it was being presented, said:

"Now the only way in which they can comply with the statute is to show the cost to Western Electric of these manufactured articles. Of what benefit is it to this Commission that Western Electric makes a general profit on its operation of 6 to 7 percent, or 4 or 5 percent? The mandate of that statute is that their manufacturing arm should come in here and state as to that old magneto set that they have out there in Syracuse, Kansas, the cost of manufacturing that was so much. That is what the statute says. When they bought in 1927 all of these old sets, to wit, the transmitter and the receiver from the A. T. & T. as was developed yesterday, did they show, or have they attempted to show how much Southwestern Bell paid the A. T. & T. for those sets which became obsolete some four or five years later?"

January 10, 1948, the same day on which the foregoing motion was filed and heard, the Commission made an order dismissing Southwestern's application. This order, containing findings of fact and conclusions of law, so definitely establishes the Commission's con-

struction of the statute that it too merits detailed reference. The contents of its important paragraphs, identified by reference or set forth in substance, are as follows:

Findings of fact:

1. The American is a holding company holding substantially all the stock of Western and Southwestern and all three corporations are affiliated companies within the meaning of applicable statutes.

2. Repeats verbatim the contents of paragraph 3 of the motion heretofore mentioned.

3. Restates the allegations of paragraph 4 of such motion.

4. There has been no showing by Southwestern as to the actual cost to Western and to American for such services, materials and commodities, nor is there an itemized statement furnished by Southwestern setting out in detail the various items, costs for services rendered and material and commodity furnished by the holding or affiliated companies, or either of them.

5. The evidence is of such nature that while it is possible for the Commission to determine the charges described in findings of fact 2 and 3 (3 and 4 of the motion) are substantial, it is impossible for it to determine the exact or approximate total amount of the charges described in either of such findings.

6. Under the evidence it is impossible to determine the amount of net revenues which Southwestern is receiving for the reason, among others, they are affected by the depreciation currently taken, which depreciation must be tested against Southwestern's investment. Under the evidence as affected by the statute it is impossible to determine Southwestern's investment.

Conclusions of law:

1. Is a restatement of paragraph 2 of the motion heretofore described.

2. Under the provisions of G. S. 1935, 66-1403 (as heretofore quoted) no charges for services rendered or for materials or commodities furnished by the above named affiliated companies to Southwestern may be given consideration by the Commission in its determination of a reasonable rate or charge to be made by Southwestern to its rate payers unless there be a showing made by Southwestern as to the actual cost to Western and to American respectively, for such services, materials and commodities.

3. When all that part of the evidence offered by Southwestern which cannot be considered by the Commission by reason of the

statute is eliminated from the entire evidence offered, there remains nothing in the evidence taken in the most favorable light to Southwestern upon which the Commission can grant Southwestern the relief prayed for.

4. The motion should be sustained and the application dismissed.

Some two weeks after the dismissal of its original application Southwestern sought to obtain a rehearing upon grounds, the general nature of which were to the effect, that the Commission's action in dismissing its application was unlawful, unreasonable, improper and unfair. Inasmuch as Southwestern concedes the construction to be given the statute is that placed upon it by the trial court, whose findings with respect thereto will presently be set forth, the details of its application for rehearing are not as essential for informative purposes as those of the motion and order to which we have heretofore referred. However, such application does reveal Southwestern's interpretation of the statute, its views as to the extent and character of evidence required in order to conform with its terms and other matters facilitating a proper understanding of what was before the Commission at the moment it made its order of dismissal. For that reason, a copy thereof, omitting the exhibits therein referred to, is appended to and made a part of this opinion.

Southwestern's application for rehearing was denied by the Commission on February 2, 1948, on the ground that no reason appeared why it should be granted and the proceeding reopened.

March 3, 1948 (pursuant to G. S. 1935, 66-118a to 66-118o, inclusive), Southwestern filed an application for a review of the Commission's action dismissing its initial application in the district court of Shawnee county. The sufficiency of the form of this application is not in question. For present purposes it can be said that while its allegations are more in detail, the grounds for relief therein relied on are substantially the same as those set out in the application for rehearing, attached hereto as an appendix, and that it prays for a judgment vacating and setting aside the Commission's order of dismissal as unlawful and unreasonable.

After certain proceedings in the district court, including denial of an ancillary order permitting Southwestern to put into temporary effect the schedules of rates filed in its dismissed application on grounds the court was without jurisdiction to grant such relief, which is not here involved because no appeal was taken from such

ruling, the district court on July 26, 1948, upon Southwestern's application, stayed the review proceeding and remanded the case to the Commission with directions to hear and consider the evidence that was proffered by Southwestern but not admitted upon the hearing of its application for a rehearing.

Previous to the rendition of the remanding order just mentioned Southwestern had filed an application for permission to put into force and effect increased temporary rates under bond designed to yield revenues amounting to approximately $3,349,000. This application was docketed by the Commission as No. 36,060-U. Part of the evidence in such docket had been heard. After the rendition of the district court's remanding order the Commission heard additional evidence in this docket on August 9-30, 1948. Eventually, on January 14, 1949, upon the evidence received in this docket the Commission entered its order approving schedules of temporary rates under bond, designed to produce additional annual revenues of $3,313,977 pending the final determination of permanent rates. Such rates are now in force and effect. Except as hereinafter stated the proceedings or rulings in such docket are not involved in this appeal.

At the conclusion of the hearing in docket 36,060-U, Southwestern filed its offer of evidence in the remanded case (docket 34,333-U). It offered as evidence in such case a large portion of the evidence it adduced and which had been received in docket 36,060-U. Subsequently, by stipulation, all of the evidence in docket 36,060-U was made a part of the record in the remanded case.

September 23, 1948, with the evidence in both dockets before it, the Commission entered an order affirming its dismissal order of January 10, 1948. This order states there was nothing in the additional evidence requiring or justifying the setting aside or modifying of such order. Thereafter it caused the enlarged record to be certified to the district court in the review proceeding there pending.

In due time review of the Commission's dismissal order came on for trial in the district court and that tribunal, in conformity with G. S. 1935, 66-118f, heard the cause upon the issues presented by the evidence and exhibits introduced before the Commission and the record as certified.

Later, after having reviewed the record and given consideration to the abstracts and briefs filed by the respective parties to the review proceeding, the district court on September 26, 1949, ren-

dered a judgment holding that the Commission's order of January 10, 1948, affirmed by its order of September 23, 1948, dismissing Southwestern's application was unreasonable and unlawful and set such order aside. At the same time it returned and adopted as a part of its judgment findings of fact and conclusions of law. Its findings of fact read:

"FINDINGS OF FACT

"1. Southwestern Bell Telephone Company, a Missouri corporation, herein referred to as Applicant, owns and operates an integrated telephone system within the states of Kansas, Missouri, Arkansas, Oklahoma, Texas and a small part of Illinois; the portion of its system located in Kansas consists of telephone lines, plant, facilities and equipment comprising 143 exchanges and numerous toll lines, furnishing both intrastate and interstate service to the public.

"2. All the stock of Applicant is owned by the American Telephone and Telegraph Company, a New York corporation, herein referred to as American. American also owns all or substantially all the stock in fifteen other operating telephone companies, a large majority in three others and a minority in three others, all such companies being herein referred to as Bell operating companies.

"3. American performs certain services for Applicant, for which Applicant pays American. These payments are charged to operating expenses in Applicant's accounts.

"4. American has for many years owned and now owns substantially all the stock of Western Electric Company, Inc., herein referred to as Western, from which Applicant has for many years bought and from which it still buys substantially all its equipment, materials and supplies, as well as certain services, both for the construction of its plant and for the maintenance and operation thereof. Things purchased for construction have been capitalized (charged to the plant investment accounts) and things purchased for use in maintenance operations have been charged to operating expenses in Applicant's accounts.

"5. Beginning in 1913 Applicant has kept its accounts in accordance with the Uniform System of Accounts for Telephone Companies, prescribed by the Interstate Commerce Commission from 1913 to 1934 and thereafter by the Federal Communications Commission, pursuant to a statute of the United States which prohibits the keeping of any other accounts than those prescribed and prohibits keeping them in any manner other than that prescribed.

"6. Applicant filed with the respondent Commission, on September 30, 1947, its application for consent to change its filed schedule of intrastate rates and put into effect new and increased schedules of rates for intrastate telephone service in Kansas. The Commission gave said application Docket No. 34,333-U.

"7. On October 9, 1947, the Commission, on its own motion, entered an order in said Docket No. 34,333-U initiating an investigation to determine whether Applicant should be permitted to change the rates then in effect, the reasonableness and lawfulness of the then current rates or a schedule of just and reasonable rates, and directing that such investigation should include the operations of Applicant, its affiliates and other segments of the Bell System which have an effect upon Applicant's rates, and ordering that the costs of such investigation be charged to Applicant.

"8. On October 20 to 23, 1947, depositions were taken by Applicant on the subject matter of costs of services, materials and commodities furnished by American and Western, and in this connection and at all times thereafter all the pertinent books and records of Applicant and its affiliates were made available to the Commission. The Commission's special counsel participated in the taking of these depositions and at their request the matter was continued until December 8, 1947, for further cross-examination, at which time the taking of these depositions was resumed and such further cross-examination was carried on from December 8 through December 10, 1947.

"9. On January 5-10, 1948, Applicant by oral and documentary evidence and depositions presented its case in support of its application.

"10. On January 10, 1948, at the conclusion of Applicant's testimony, the Commission, on the motion of its special counsel, dismissed the application on the ground that Applicant had not complied with the requirements of Section 3 of Chapter 239, L. 1931 (Section 66-1403, G. S. Kansas 1935). The dismissal order finds that Applicant did not show, in the manner and to the extent required by that statute as construed by the Commission, the costs to its affiliates of services rendered and materials and commodities furnished by them to Applicant, and concludes that the statute therefore forbids the Commission to consider the charges for such services, materials and commodities. Said order of dismissal further concludes that when that part of the evidence which cannot be considered by the Commission because of said statute is eliminated, there remains nothing in the evidence upon which the Commission can grant to Applicant the relief prayed for.

"11. Application for rehearing was filed by the Applicant in which it offered to provide certain specific proof and any additional proof desired relating to costs of services, materials and commodities furnished to it by its affiliates. That application was denied. The Applicant then instituted this proceeding for review. Thereafter, this Court stayed this proceeding and remanded the case to the Commission with directions to hear and to consider the evidence proffered by the Applicant on its application for rehearing and at the time of the presentation of that application. Additional evidence was introduced by the Applicant. No evidence was offered at any time by the Commission. On September 23, 1948, the Commission entered its order finding that the additional evidence did not require or justify a modification of its original order of dismissal and it affirmed that order. The entire record is before this Court.

"12. The evidence introduced by Applicant in these proceedings on the subject matter of the costs to its affiliated companies of services, materials and commodities furnished by them to Applicant included oral testimony consisting of approximately 3,300 pages, together with approximately 185 detailed exhibits consisting of documents, studies and records.

"13. The twenty-two Bell operating companies, of which Applicant is one, are engaged, each in its separate territory, in furnishing the same communications services with standardized equipment and uniform operating practices, and have many problems in common that can be solved better and more economically by a centralized organization on behalf of all the companies than

by each company attempting to do such work itself and duplicating the work of the others. American maintains, in its General Department and in Bell Telephone Laboratories, a subsidiary owned jointly with Western, a centralized staff of specialists who perform such work on all phases of the telephone business, including scientific research, engineering, traffic, legal, accounting and other matters, for the benefit of the Bell operating companies. For the costs of such work, together with the costs of finanical services and patent licenses and protection, American is compensated under a uniform contract called a 'license contract' under which the Bell operating companies, including Applicant, make monthly payments to American at a uniform percentage of their operating revenues.

"14. The services rendered by American under the license contracts, with minor exceptions, are not individual services rendered to individual companies or areas. They are general in nature and are done simultaneously for all the Bell operating companies. Each such company is entitled to the benefits from all the work done and only one charge is made for the entire mass of services. The cost of maintaining a centralized staff by American, including the centralized research done by it through Bell Telephone Laboratories, is a cost common to all the Bell operating companies, and the cost of the license contract services rendered to each such company can only be determined by apportionment on some appropriate basis.

"15. Applicant's evidence included a statement of all costs to American, separated between those applicable to the license contract, called 'license costs,' and those not so applicable, termed 'non-license costs.' American's 'license costs' were divided and itemized to show the cost to the Bell Laboratories and the General Department of American. Such costs were further itemized and divided as between the various divisions of the Bell Laboratories and the General Department of American. Each of these subdivisions of American's costs attributable to the services rendered all the Bell operating companies under the license contracts was then allocated among the licensee companies, including Applicant, and to Applicant in the State of Kansas, on the basis of factors appropriate to the nature of the work performed in each instance, e. g., the cost of maintaining the Plant Engineering Division of the American Company, whose function is to advise and assist on problems concerned with the operating companies' plant, was apportioned on the basis of the relative amount of plant in each operating company. All such costs were actual costs to American, and did not cease to be actual when they were apportioned. Such costs were shown in the detail hereinbefore specified for the years 1946 and 1947, and in summary form for the nine years prior thereto. Payments made under the license contract are not capitalized by Applicant but are reflected only in the current year's operating expenses. To determine the reasonableness of rates for the future only a statement of such payments for the past few years is material. That, the Applicant showed.

"16. Western manufactures and sells to the Bell operating companies approximately 48,000 separate varieties of things and in addition purchases from others and sells to the Bell operating companies approximately 30,000 varieties of supplies.

"17. The bills from Western covering all services, materials and commodities funished by it to Applicant from 1916 to April 30, 1948, contained approximately 18,000,000 billing 'items.' Of these approximately 2,700,000 to 3,000,000 were used in Kansas operations. Applicants furnished the Commission with all of the original bills from Western relating to its Kansas operations. In many instances a single billing item, such as a central office addition, represents thousands of different varieties of manufactured items each of which has a separately determined price. Moreover, a single billing item frequently represents a large number of identical physical units, so that the number of individual physical units purchased from Western by Applicant is many times the number of billing items.

"18. The accounts of Applicant reflect dollars of investment or expenses rather than physical units of material or apparatus. These dollars include not only purchases from Western but other expenditures of Applicants, such as wages of its employees, payments to outside contractors and taxes. When physical units of plant are purchased and installed, their cost is charged to a plant account, e. g., central office equipment, and when such a unit is removed from service its estimated original cost is credited to that account, the estimated unit cost being in most cases the average unit cost of all like units, no attempt being made to identify the unit retired with a particular purchase order. Since all the millions of units which enter into the plant and are later removed from it are not tagged to particular billing orders, it is not known by billing items what physical units of material purchased from Western are surviving in the plant accounts. Since the cost to Western of such units will vary depending on the year of manufacture, it is impossible to determine the cost of surviving units unless they can be associated with the original billing from Western.

"19. A large part of Applicant's plant presently devoted to its intrastate business in Kansas was installed therein during the fifteen years prior to the enactment of Section 66-1403, G. S. Kansas 1935. Said section makes no differentiation in the type of cost statement required dependent upon whether the purchases were made before or after its enactment. The millions of physical units comprising the portion of the plant installed prior to the enactment of the statute had not been tagged in and out of Applicant's plant and it was impossible, therefore, at the time the Act was passed and is still impossible to associate the surviving physical units with the billing items on Western's bills under which they were purchased.

"While it might have been theoretically possible begining with the passage of the Act to have tabulated each of the millions of physical units thereafter purchased in and out of Applicant's books, associating each with its billing from Western and thus to have obtained a partial list by billing items of the plant surviving, this would have been a task burdensome beyond all reason and impossible as a practical matter.

"20. Since the millions of physical units purchased from Western and presently surviving in Applicant's plant cannot be identified with the billing items. under which they were purchased from Western, it would be impossible to furnish a statement of the cost to Western of each unit now surviving for which

a separate charge was made, even if the individual cost of each such unit billed were known.

"21. Western can compute the approximate unit cost to it of all physical units it manufactures in a given year by methods which begin with an estimate (standard shop cost) and involve a very large number of apportionments but which nevertheless achieve results close enough to actual cost to be accepted as such for all practical purposes by manufacturing companies which make a large variety of items. These costs cannot be computed for any one year until the year is over and the books for that year have been closed, which is ordinarily after most of the product of that year has been sold. Since Western manufactures tens of thousands of different physical units, and since computation of the cost of each requires a large number of apportionments and calculations, Western does not ordinarily compute the current complete cost of individual physical units but only of classes or groups. The Commission was furnished with the standard shop cost of each individual physical unit which Western manufactured from 1916 to 1947 and also the annual variation and other apportionment factors by classes of products necessary to compute the current complete cost to Western of any one of the physical units manufactured. It would be theoretically possible from this data to compute the complete cost to Western of each of the physical units represented by the 2,700,000 to 3,000,000 billing items applicable to Kansas for the period 1916 to 1947, inclusive, but to do so for all of the items would require 500 man-years of accounting effort. Since accountants must work from the same records, it is doubtful that more than twenty to thirty could be used at one time. Assuming twenty-five could be used, it would take twenty years to complete such a statement. If fifty were used, it would take ten years. This constitutes impossibility for all practical purposes. The mere listing of these costs would require 240 volumes of 500 pages each.

"22. To determine the cost to Western of each individual article furnished by Western to Applicant and for which a separate charge was made and paid and which now remains in Applicant's plant would be impossible.

"23. In respect to the cost to Western of services, materials and commodities furnished by it to Applicant, Applicant showed by relevant evidence:

"(a) The total sales of Western to all Bell Companies and the cost to Western of such sales for each year from 1916 to 1947, inclusive, itemized into the three product classes (apparatus and equipment, lead-covered cable and wire and supplies).

"(b) The total sales of Western to Applicant and the cost to Western of such sales for each year from 1916 to 1947, inclusive, itemized into the three product classes.

"(c) The sales of Western to Applicant for its use in Kansas and the cost to Western of such sales for each year from 1916 to 1947, inclusive, itemized into the three product classes.

"(d) The amount in dollars of telephone plant placed each year from 1916 to 1947, inclusive, that remained in Applicant's Kansas plant and in its plant accounts on December 31, 1947, a total of $68,469,324; the portion of that total represented by purchases from Western, $41,587,558, and the cost to Western

thereof, $39,950,186. These purchases and the respective costs to Western were shown separately for each year for each major plant account prescribed in the Uniform System of Accounts, to wit: franchises, rights of way, land, buildings, central office equipment, station apparatus, station installations, drop and block wire, private branch exchanges, booths and special fittings, pole lines, cable, exchange aerial wire, toll aerial wire, underground conduit, furniture and fixtures, and vehicles. The purchases in each major plant account were further itemized into the three product classes for each of the years 1916 to 1947, inclusive. Of the total purchases from Western reflected in Applicant's surviving plant, only 3.9 percent were made prior to 1916. Because of the lack of adequate data for years prior to 1916, it is impossible for Applicant to furnish the cost to Western of such purchases.

"(e) The amount paid to Western in each of the five years, 1943 to 1947, for services and materials furnished by Western to Southwestern for use in · the maintenance and operation of its plant in Kansas and which were charged to Applicant's expense accounts, and the cost thereof to Western, broken down as to groups of expense accounts, which expense accounts are those required by the Uniform System of Accounts. Such total purchases from Western, in each expense account, is further classified into the three product classes, together with the cost thereof, by product classes.

"(f) Cost to Western for services performed by it for Applicant, consisting of (i) disposing of junk material, called Class B Service, and (ii) of inspecting, insuring, servicing and reissuing materials returned to Western, called Class C Service, and (iii) of other services referred to as Miscellaneous Distributing House Services, were shown by Applicant for the eight-year period 1940 through 1947; and the cost to Western of furnishing repair service for Applicant was also shown separately for the years 1943 to 1947.

"24. The methods followed and the apportionments and computations made in determining the costs to Western of services, materials and commodities furnished to Applicant, as shown by Applicant's evidence herein, were in accordance with accepted cost accounting procedures and produced the most accurate statement of actual cost to Western of such services, materials and commodities which it was possible to make.

"25. The evidence introduced by Applicant in this case constituted a statement of the actual cost to Applicant's affiliates of services, materials and commodities furnished by them to Applicant in sufficient itemization and detail to enable the Commission to determine the profits made by said affiliates, and each of them, of such transactions with Applicant, the reasonableness of the charges made by said affiliates to Applicant for such services, materials and commodities, and the extent to which such charges and profits affect the reasonableness of Applicant's rates for its intrastate services in Kansas.

"26. Unless the payments by Applicant to its affiliates be ignored in determining its investment and its operating expenses, the record shows conclusively by uncontroverted testimony that Applicant's revenues from its intrastate operations in Kansas were less than the expense of such operations, resulting not only in no return on the capital employed but an actual operating deficit during the entire year 1947 and the first four months of 1948."

Within three days from the date of the judgment the Commission filed a motion for a new trial wherein it attacked conclusions of law Nos. 2, 3, 4 and 5 made by the trial court and all its findings of fact except findings Nos. 1, 2, 3, 4, 6, 7, 9, 10 and 16. Along with this motion it filed specific objections to such findings of fact and in addition requested findings in lieu of those made by the court in the event it adhered to its judgment.

On November 23, 1949, the Commission perfected an appeal from the court's judgment of September 26. The appeal was docketed in this court as case No. 37,941.

Two days later the Commission's motion for a new trial was overruled. Subsequently, on January 3, 1950, it filed its notice of appeal from the order overruling such motion. This is the appeal involved in case No. 37,984.

When what has been heretofore related at considerable length for the specific purpose of thoroughly demonstrating their respective positions is carefully analyzed, there can be no question as to how the parties claimed the provisions of section 3, chapter 239, Laws for 1931 (G. S. 1935, 66-1403), hereinafter referred to as the statute, should be construed at the several hearings before the Commission. Briefly summarized it can be said that at that time counsel for the Commission contended and the Commission held that the actual cost to Southwestern's affiliates, Western and American, for services, materials and commodities furnished or sold to Southwestern by such affiliates from 1916 to 1946, inclusive, together with the charges made by them, including physical items no longer remaining in its plant, must be shown and itemized, item by item, otherwise there was no compliance with the statute and therefore no evidence which would warrant it in proceeding to determine the merits of Southwestern's application. On the other hand Southwestern took the position that an itemization of the costs of such services, materials and commodities by years and product classes, with underlying detail as to the elements of costs making up the total of costs so itemized, was all that the statute required.

It must be remembered that the fundamental premise upon which the Commission based its order of dismissal was that when all of the evidence offered by Southwestern which could not be considered because of the statute was eliminated from the entire evidence offered nothing remained in the evidence, viewed in its most

favorable light, upon which it could grant Southwestern any relief. When this is kept in mind it becomes obvious from the very nature of the single question the parties agree is now involved our task is not to weigh the evidence reflected in the extensive record which has been presented but to determine whether the evidence adduced in support of Southwestern's application comes within the scope of the statute. It becomes even more manifest when—as here—it clearly appears that throughout the entire proceedings before the Commission and in the court below the basic differences between the parties arose over the type of evidence which would meet its requirements.

Notwithstanding the view just expressed the court has painstakingly examined the evidence as abstracted for the purpose of reaching its own decision with respect thereto. It had just as well be now stated that after making that examination it has determined, that except for a few minor matters not deemed sufficiently important to require specific mention, the trial court in its findings of fact not only correctly summarized the evidence before the Commission at the conclusion of the hearing on Southwestern's application but gave it the import to which it was entitled and that such findings should be approved.

In determining the findings of fact warrant our approval we have not been unmindful of the Commission's objections to such findings or its request for additional findings, heretofore referred to. The fact they have not been detailed or given specific attention in this opinion does not mean they have been overlooked. It suffices to say that after giving careful consideration to arguments made in their support we have decided the evidence does not warrant the sustaining of either the objections to findings or the request for additional findings and that to deal at length with contentions advanced with respect thereto or to detail the testimony on which the findings depend would not contribute anything of importance to the body of our law or add to this opinion.

Both in their briefs and in oral argument the parties not only concede but affirmatively assert the sole and all decisive issue involved in this appeal is whether Southwestern's showing before the Commission was of such character as to constitute compliance with the requirements of the statute.

Thus, it is interesting to note, although it is in no sense to be regarded as controlling of our decision, that we are now called upon for the first time to construe a statute which the record clearly re-

veals has been the law of this state since its enactment in 1931; has been interpreted by the Commission in former rate hearings in line with the construction contended for by Southwestern; and is the only statute of its kind and character to be found today in the forty-eight states of the union.

In view of the issue and in the interest of clarity we deem it worth-while to again quote the statute even though it is to be found elsewhere in the opinion. It reads:

"SEC. 3. In ascertaining the reasonableness of a rate or charge to be made by a public utility, no charge for services rendered by a holding or affiliated company, or charge for material or commodity furnished or purchased from a holding or affiliated company, shall be given consideration in determining a reasonable rate or charge unless there be a showing made by the utility affected by the rate or charge as to the actual cost to the holding or affiliated company furnishing such service and material or commodity. Such showing shall consist of an itemized statement furnished by the utility setting out in detail the various items, cost for services rendered and material or commodity furnished by the holding or affiliated company." (G. S. 1935, 66-1403.)

In rendering judgment the trial court made and incorporated in its decree four all important and controlling conclusions of law. Conclusion No. 2 is limited strictly to its construction of the statute, Nos. 3 and 4 deal with the sufficiency of the evidence under that construction, while No. 5 merely indicates the nature of the judgment. Such conclusions of law read:

"2. Section 66-1403, G. S. Kansas 1935, applies in a wide variety of circumstances, at one extreme to an affiliate selling a single commodity and at the other extreme to one selling tens of thousands of different things, and was intended to require only such character and amount of itemization and detail as would be practicable and reasonable in the circumstances of the particular case, having regard to the purpose the statute was intended to serve. That purpose is to enable the Commission to determine whether a public utility's investment, rate base or operating expenses have been inflated by charges by affiliates which include unreasonable profits to such affiliates, so that the Commission may disallow the unreasonable part, if any, in determining the reasonableness of the public utility's rates.

"3. In the hearings before the Commission, Applicant made the required statutory showing in sufficient detail and with sufficient itemization, under the foregoing or under any reasonable interpretation of the statute, of the actual cost to the affiliated companies, American and Western, of services, materials and commodities furnished to it, and Applicant complied with the requirements of Section 66-1403, G. S. Kansas 1935.

"4. There was sufficient evidence furnished to the respondent Commission of the cost to Western of materials and services purchased from it by Applicant, and the cost to American of the services rendered by it to Applicant from which evidence the Commission could have determined the amount of such

costs and the reasonableness of the charges made by said affiliates to Applicant; and the refusal of the respondent Commission to consider such charges was unlawful and unreasonable.

"5. The order of the Commission of January 10, 1948, affirmed by its order of September 23, 1948, was unreasonable and unlawful and should be set aside."

Where—as here—a court is required to construe a statute for the first time without the benefit of legal precedent and all that it has before it is extended argument regarding the claims of the parties as to how they believe such statute should be construed we know of no sound reason for prolonging its opinion by detailing their respective contentions. Rather we conceive it to be its duty to give proper weight to each and every contention advanced and then, guided by well established rules of statutory construction, reach and announce its own independent conclusion as to how the statute must be interpreted. That we have done in the case at bar. It suffices to say that after long and careful consideration of everything the parties have had to say in their briefs and in their oral arguments we have concluded the statute must be construed as set forth in the trial court's conclusion of law No. 2 which has been heretofore fully quoted and therefore need not be repeated. When so construed we have little difficulty in further concluding that under the evidence as reflected by the findings of fact its conclusions of laws Nos. 2, 3, 4 and 5 are likewise correct and that such conclusions, as well as its judgment decreeing the Commission's order of dismissal was unreasonable and unlawful, must be confirmed and approved.

In conclusion, to insure against all possibility of misunderstanding as to its import, it should perhaps be pointed out that this opinion is limited strictly to the sole issue here involved, namely, the construction to be given the affiliate statute, and that the question whether Southwestern is to be granted or denied increased rates as requested in its application is a matter yet to be determined by the Commission after a full and complete hearing on the merits of the rate proceeding instituted by Southwestern.

The judgment is affirmed.

## APPENDIX

### APPLICATION FOR REHEARING

Comes now Southwestern Bell Telephone Company, the applicant herein, and moves the Commission for a rehearing in the above entitled matter for the reason that the order or decision of the Commission dismissing applicant's application for permission to put into effect in Kansas new schedules for its intrastate toll and exchange rate classification is unlawful, unreasonable, improper and unfair. In support of this application applicant states that:

1. Said order or decision of the Commission dismissing applicant's application constitutes a refusal of the Commission's consent as required by G. S. 1935, section 66-117, to applicant's putting into effect new schedules of rates for its intrastate toll and exchange rate classifications and is a direction that applicant continue to furnish said service in the state of Kansas under its presently filed intrastate toll and exchange rate classifications. The uncontroverted evidence before this Commission shows that the presently existing rates for applicant's intrastate toll and exchange rate classifications are unreasonably low and confiscatory; and accordingly said order is in violation of the statutes and laws of the state of Kansas.

2. Finding No. 4, which is in general a summary of all the other findings, provides as follows:

"There has been no showing in the evidence adduced by the Applicant, Southwestern Bell Telephone Company, as to the actual cost to the Western Electric Company and to the American Telephone and Telegraph Company respectively of such services, materials and commodities, nor is there an itemized statement furnished by the Applicant setting out in detail the various items, cost for services rendered and material or commodity furnished by the holding or affiliated companies, or either of them."

From said finding the Commission concludes as a matter of law:

"(2) Under the provisions of Section 3 of Chapter 239 of the 1931 Session Laws of Kansas no charge for services rendered or for materials or commodities furnished by the above named affiliated companies to the Southwestern Bell Telephone Company may be given consideration by the Commission in its determination of a reasonable rate or charge to be made by Southwestern Bell Telephone Company to its rate payers unless there be a showing made by the Southwestern Bell Telephone Company as to the actual cost to the Western Electric Company and to the American Telephone and Telegraph Company, respectively, for such services, materials and commodities.

"(3) When all that part of the evidence offered by Applicant which cannot be considered by the Commission by reason of the provisions of the statute is eliminated from the entire evidence offered, there remains nothing in the evidence taken in its most favorable light to the Applicant upon which the Commission can grant to the Applicant the relief prayed for."

The aforesaid interpretation of said statute by the Commission, as applied in the circumstances of this case, is extreme, harsh, and erroneous and inflicts upon this applicant an impossibility of proof.

3. Section 3 of chapter 239 of the 1931 Session Laws of Kansas does not attempt to specify the amount of itemization and detail which the statement thereby required shall contain and the only reasonable construction of the statute is that the statement shall contain such itemization and detail as is practicable and reasonable in the circumstances of the particular case, having regard both to the nature of the services, material or commodity furnished in the particular case and the purpose which the statute is intended to serve.

4. To determine the actual cost to Western Electric Company, Inc. (hereinafter called Western), of the separate items which it has furnished to applicant and which are a part of the plant of applicant in Kansas would be impossible. In 1946 alone Western manufactured several hundred million items of apparatus and equipment, of which there were approximately 44,000 varieties (each differing from the other) and it manufactured over 150,000 different varieties of piece parts going into those various items.

The actual cost of manufacture of an identical item will vary substantially with variations in volume of production, material prices, wage rates, labor efficiency, amount of overtime and other variables, and it necessarily follows that the actual cost of manufacturing an identical item, even in the same shop, will vary depending on the conditions prevailing at the time of its manufacture.

To attempt to ascertain the actual cost to Western of the items which will be incorporated in the telephone plant in a particular state by keeping job costs on each item or batch of items as produced and then tagging those items through to their ultimate destination so that actual cost so determined could be associated with each item in the telephone plant, would be a task of such tremendous magnitude as to be impossible as a practical matter. Its cost, in the case of many small items, might well exceed the cost of manufacture. Furthermore, statement of costs arrived at by such methods would be unreliable because the opportunity for multiplicity of error would be so great with the vast amount of detailed record keeping and tremendous number of calculations required.

Applicant is informed and believes that no corporation manufacturing a large variety of complex products attempts to do its cost accounting in the manner above described or employs a cost accounting system designed to segregate the cost of its sales to a particular customer from the cost of its total sales. The only method by which such a corporation can determine the cost of its sales to a particular customer is by the use of apportionments on the basis of product classes. Applicant relies on the affidavit of Eric A. Camman hereto attached as Exhibit 1 in support of the foregoing allegations.

Apart from articles which it manufactures, Western purchases a great variety of supplies from thousands of other manufacturers and suppliers for resale to Bell System companies, including applicant. Those supplies comprise well over thirty thousand varieties of items (each differing from the other). The price paid by Western for those supplies varies, depending on the time and place of purchase, as do Western's handling and related costs. To tag each such item through to its ultimate usage would be a task of such tremendous magnitude as to be impossible as a practical matter.

5. Even if it had been possible to ascertain the actual cost of each different item furnished to applicant by Western in each year, the task of ascertaining the total cost to Western of all such items by the process of itemization and cumulation would be of such magnitude as to be wholly unreasonable. For the period of 1916-1946, inclusive, applicant estimates that the number of entries on Western's bills to applicant was in the neighborhood of eighteen million.

6. Applicant showed by the testimony of Burton R. Young the cost of sales of Western to the operating telephone companies of the Bell System separated from its cost of total sales to all customers for each year of the period of 1916-1946, inclusive. To ascertain such costs prior to 1916 would be a task of tremendous magnitude due to the condition of the records for earlier years. Applicant estimates that less than 2 percent of the book cost of its plant in Kansas as of October 31, 1947, is represented by charges by Western to applicant prior to 1916.

Applicant also showed by the testimony of said Burton R. Young, Western's percentage profit on its total sales to Bell customers in each of the years 1916-1946, inclusive, and its percentage profit on sales to applicants alone for said total period. Said testimony showed that said percentage profit on sales to applicant alone was based on a study. Said study shows the costs of Western's sales to applicant in each of Western's three main product classes in each

of the 31 years, the costs of sales to applicant in each of said product classes being obtained by apportionment of the cost of sales within that product class to all Bell Companies. Applicant did not offer this study in evidence, since it believed that the profit to Western was the ultimate fact to be ascertained, and that Western's cost of sales to applicant was only an intermediate step in ascertaining such profit. A tabulation of the results of said study showing cost of Western's sales to applicant in each of the three main product classes in each year is appended as Exhbit A to the affidavit of Eric A. Camman hereto attached.

Said three main product classes constitute the most logical division of Western's sales into classes. The first class, apparatus and equipment, consists principally of articles manufactured by Western of a highly fabricated character, many of the component parts of which are interchangeable and where the cost of fabrication is the most important single element of cost. The second class, lead-covered cable and wire, consists of products manufactured by Western where the cost of raw materials (principally copper and lead) is the principal element of cost. The third class, supplies, consists of articles purchased by Western from other manufacturers and suppliers for resale, where Western's costs are composed principally of the purchase price and the cost of purchasing, warehousing and distributing.

Applicant believes that the apportioned total cost of Western's sales to applicant over the period 1916-1946, inclusive, arrived at by apportionments on the basis of product classes in each of the thirty-one years is more accurate than would be a statement of cost built up by cumulating job costs of individual items, assuming that were possible, and, as set forth in said Exhibit A, is as accurate and in as much detail of itemization as it is practicable to obtain by any method within the bounds of reasonable possibility.

All the operating telephone companies of the Bell System are employed in rendering telephone service of the same general character, with the same general type of plant, which is highly standardized and in which there is a high degree of uniformity; and sales to applicant over the period 1916 to 1946, inclusive, are a fair cross-section of Western's sales to all Bell Telephone Companies over that period. The price of any item which Western sells is and has been the same to all Bell Telephone Companies throughout said period.

Applicant keeps its accounts in accordance with the Uniform System of Accounts prescribed by the Commission and the Federal

Communications Commission. Such accounts do not show separately the portion of its purchases from Western Electric Company used in its telephone operations in the State of Kansas. However, for the further information of the Commission, applicant has made an estimate of the portion of such purchases used in operations in Kansas on the basis of the relative gross additions to its plant accounts by years for the period from 1916 to 1946, inclusive. It has also estimated the cost to Western of such purchases in the same manner as that used to determine the cost to Western of its sales to applicant shown on Exhibit A of the Camman affidavit hereto attached. The estimated sales and cost of sales apportioned in such manner to the State of Kansas are shown on Exhibit 2 attached.

7. Applicant showed by the testimony of Harry C. Gretz that the services rendered to the operating telephone companies by the American Telephone and Telegraph Company consist largely of work done on problems common to all of the companies, which can be done more efficiently and more economically in a centralized group than if each company attempted to perform the work itself; that fundamental research, system engineering and standardization and the other centralized services furnished by the American Telephone and Telegraph Company are undertaken on behalf and for the benefit of all of the operating telephone companies simultaneously so that the costs thereof are not susceptible of specific segregation by companies, but must be apportioned.

Applicant showed by the testimony of said Harry C. Gretz the costs to the American Telephone and Telegraph Company of the services rendered to the operating telephone companies separated from all other costs for the year 1946, and an apportionment of such costs by items of expense to the applicant's operations in the State of Kansas based upon factors shown to be appropriate for each item of expense. Applicant showed such apportioned cost by years for period 1937-1946, inclusive.

The apportioned cost of services furnished by the American Telephone and Telegraph Company to applicant for the years 1937-1946, inclusive, arrived at in the manner above described is accurate and in as much detail of itemization as it is practicable to obtain within the bounds of reasonable possibility.

8. It is impossible to identify the particular purchases from Western over a long period of years which were charged to applicant's plant accounts and now remain therein, but applicant con-

siders that such purchases probably represent about forty-five percent to fifty-five percent of its total plant investment in Kansas.

The extent to which payments to the American Telephone and Telegraph Company enter into applicant's operating expense accounts is fully shown by the record in this case.

Applicant estimates that payments to Western charged to applicant's operating expense accounts (principally maintenance) for the four months ending October 31, 1947, amounted to approximately $470,000, including payments for both materials and services, or $1,410,000 on an annual basis.

9. The decision and order of the Commission in this case is a departure from the course which the Commission has heretofore taken in determining the character of proof required under section 3, chapter 239, of the 1931 Session Laws of Kansas. In Docket No. 13777, this Commission, the present applicant and the city of Hutchinson stipulated a record pertaining to this subject which went no further, if indeed as far, as the record in this case pertaining to the same subject. The Commission in reaching an order in that case necessarily accepted said evidence as sufficient proof of the reasonableness of the charges made for service rendered and the charges for materials and commodities furnished by the Western Electric Company and the American Telephone and Telegraph Company. Such proof as made by the evidence adduced in Docket No. 13777 has been consistently accepted by this Commission in various rate proceedings involving this applicant subsequent to the date when such evidence was presented in said Docket. Formal orders have been issued increasing rates of this applicant in numerous proceedings, including those in Docket Nos. 17441, 18429, 19099, 19206, 19207, 19232, 19344, 19629-U, 19628-U, 19627-U, 20173-U, 20879-U, 21343-U, 21440-U, 21209-U, 21688-U, 22148-U, 22281-U, and 22402-U, without the requirement of any additional showing on the subject matter at issue herein, except the evidence previously presented in Docket No. 13777. The Commission throughout all of the intervening years has thus interpreted said statute as requiring no more than the character of proof presented in Docket No. 13777 and in this case.

10. Section 3 of chapter 239 of the 1931 Session Laws of Kansas, historically construed as aforesaid by this Commission, meets the tests of constitutionality. The interpretation of said statute by this Commission in its present order, however, would render said statute void as in conflict with the Fourteenth Amendment to the

Constitution of the United States in denying applicant due process of law because of the impossibility of compliance as herein alleged.

11. The applicant offers to prove the facts alleged in this application and those contained in the exhibits attached hereto, and if rehearing is granted and this case reopened, applicant will so prove said facts.