No. 48,097

CENTRAL KANSAS POWER COMPANY, *Appellee*, v. THE STATE CORPO-
RATION COMMISSION OF THE STATE OF KANSAS, *Appellant*.

(561 P. 2d 779)

Opinion filed
March 5, 1977.

*Jenifer L. Ewbank*, assistant general counsel, argued the cause, and *Sard Fleeker*, deputy general counsel, was with her on the brief for the appellant.

*James C. Mordy*, of Morrison, Hecker, Curtis, Kuder & Parrish, of Kansas City, Missouri, argued the cause, and *T. Nelson Mann*, of the same firm, and *Thomas E. Gleason*, of Ottawa, were with him on the brief for the appellee.

The opinion of the court was delivered by

FROMME, J.: The Corporation Commission of the State of Kansas (KCC) appeals from an order of the District Court of Graham County, Kansas. The district court set aside an order of the KCC which denied in part a rate increase request filed by Central Kansas Power Company (CKP). The district court held that the method of allocation used by KCC in determining the value of the utility's property for rate-making purposes was unreasonable and that the method suggested in the application for rate increase by CKP should be approved and adopted by KCC.

At the outset it is noted that a rate of return of 8.75% was authorized by the KCC, and CKP does not question the reasonableness of this rate of return. In the appeal to the district court CKP questioned the adjusted rate base ($15,571,086) determined by KCC, which base was used in place of the rate base suggested by CKP ($17,521,078). The rate base as adjusted by KCC permitted CKP to increase its revenues by $460,978 in place of $640,432 as requested in the application of CKP.

K. S. A. 66-118a, et seq., provide for the procedure to be followed and the scope of judicial review permitted in reviewing orders of the KCC. No procedural questions are presented in this appeal. No question is raised as to the lawfulness of the order. K. S. A. 66-118d covers the scope of judicial review of such orders and in part provides:

". . . Said proceedings for review shall be for the purpose of having the lawfulness or reasonableness of the original order or decision or the order or decision on rehearing inquired into and determined, and the district court hearing said cause shall have the power to vacate or set aside such order or decision on the ground that such order or decision is unlawful or unreasonable. . . ."

Appellee states on appeal:

". . . [W]e suggest that this is really not an issue of sufficiency of the evidence, but involves the more basic and fundamental question of whether or not a rational and logical basis exists for the Commission decision and order, and whether it is fair, wise and just."

The question of the scope of judicial review of orders of the KCC was addressed in *Southwestern Bell Tel. Co. v. State Corporation Commission*, 192 Kan. 39, 386 P. 2d 515, as follows:

"The district court in reviewing an order of the Commission acts in an appellate capacity.

"This court, on appeal from the district court in such cases, is reviewing the propriety of the decision of an inferior appellate tribunal. The legisla-

ture has not defined the limits or responsibility of this court on appeal. However, its responsibility is apparent. It must review the record for the purpose of determining whether the district court observed the requirements and restrictions placed upon it by statute. (*Thompson v. Commerce Com.,* 1 Ill. 2d 350, 115 N. E. 2d 622.)

"The statute providing for proceedings on appeal from an order of the Commission is a directive to the district court as to the nature and extent of its review, and on appeal to the Supreme Court it must determine whether the district court has properly determined the matters to which its powers and duties extend. (*Birmingham Electric Co. v. Alabama Pub. Serv. Com'n.,* 254 Ala. 140, 47 So. 2d 455.)" (p. 49.)

The above statement in the *Southwestern Bell Tel. Co.* case was more recently quoted and approved in *Missouri Pacific Rld. Co. v. State Corporation Commission,* 205 Kan. 610, 624, 470 P. 2d 767.

In *Central Kansas Power Co. v. State Corporation Commission,* 206 Kan. 670, 482 P. 2d 1, it is said:

"The need for supervision and control of electric public utilities was recognized by the legislature and by statute the legislature authorized a considerable degree of discretion to be exercised in the public interest. The discretionary authority was delegated to the commission, not to the courts. The power of review does not give the courts authority to substitute their judgment for that of the commission. . . ." (p. 675.)

In *Kansas-Nebraska Natural Gas Co. v. State Corporation Commission,* 217 Kan. 604, 538 P. 2d 702, this court observes:

". . . An order of the corporation commission based upon substantial competent evidence will generally be considered reasonable. On review of an order of the state corporation commission, the district court may not vacate or set aside such order merely on the ground that such court would have arrived at a different conclusion had it been the trier of facts. It is only when the commission's determination is so wide of the mark as to be outside the realm of fair debate that the court may nullify it. (*Graves Truck Line, Inc., v. State Corporation Commission,* 215 Kan. 565, Syl. ¶ 5, 527 P. 2d 1065.)" (pp. 616-617.)

We turn now to the present case. The differences in the amounts of the rate base as proposed by CKP and as later adjusted by KCC arose from the different treatment afforded one of eighteen electric generating units utilized by CKP. This one generating unit, located at Hill City, Kansas, was built with money from the United States Government. The money was made available by a rural electrification loan obtained by Sunflower Electric Cooperative, Inc., of WaKeeney, Kansas. The generating unit is referred to by the parties as the Ross Beach No. 2 plant. During the base year used to determine a fair rate of return CKP generated approximately 75% and purchased 25% of its electric energy requirements.

The electric energy purchased was obtained from another generating utility, Kansas Power and Light Company.

CKP furnishes electric service to retail customers in the State of Kansas. These are referred to as the Kansas jurisdictional customers and the rates for such service are under the control of KCC. It is these rates with which we are presently concerned.

In addition CKP furnishes electric energy to Sunflower Electric Cooperative, Inc. (Sunflower), a wholesale customer, and the rates for that service are under the control of the Federal Power Commission. Sunflower is referred to as a federal jurisdictional customer. We are not concerned with federal jurisdictional rates in the present application.

Since CKP and its generating and transmitting facilities serve both Kansas jurisdictional customers and federal jurisdictional customers it becomes necessary in determining rates for Kansas jurisdictional customers to utilize some method which will allocate the total investment and operation expense, and maintenance expenses associated with the production and transmission function, between the two classes of service. It was a difference in the method used by KCC in making an allocation which resulted in reducing the request for increase in revenue.

The method used in support of the $640,432 increase proposed by CKP was based on a separation of the Ross Beach No. 2 plant from the rest of the generating and transmitting facilities. CKP assigned that plant's investment, operation and maintenance expenses, including principal and interest paid by CKP on the REA loan, to federal jurisdictional service. In addition a fractional percentage (10.20%) of the balance of the CKP generating and transmitting facilities was allocated to federal jurisdictional service. Justification for CKP's method of allocation was based in large part on two facts: (1) Legal title to the Ross Beach No. 2 plant was held by Sunflower subject to a contract; and (2) energy requirements and service to Sunflower more than equaled the generating capability of that particular plant.

In support of the reduction of income KCC treated the Ross Beach No. 2 plant as an integral part of the entire generating and transmitting facilities of CKP. Using a formula based upon the relative use of the entire facility, KCC made allocation between the Kansas and the federal jurisdictional customers. In order to understand some of the reasons behind the two different positions taken it is necessary to set out some background facts regarding con-

struction, ownership and operation of the Ross Beach No. 2 plant.

The Ross Beach No. 2 plant was constructed in 1957. For many years prior to 1957, CKP had provided electric energy to four distribution cooperatives in northwestern Kansas. The demands of these cooperatives were increasing along with the demands of the Kansas jurisdictional customers. Additional capacity was needed to satisfy the load demands. The four distribution cooperatives plus two other cooperatives in southwestern Kansas banded together to form Sunflower Electric Cooperative, Inc., for the purpose of obtaining funds through the Rural Electrification Administration to finance construction of a new generating plant. The loan was at 2% interest and was for the construction of a 22,000 kilowatt plant to be located adjacent to an existing generating plant of CKP at Hill City, Kansas. The rate of interest on the loan was much lower than CKP could have obtained from other sources.

Contemporaneous with an application for the loan Sunflower and CKP entered into a contract for the construction and operation of the Ross Beach No. 2 plant "in order to make electric power and energy available to the Cooperative for the Member Cooperatives". The contract obligated CKP to cause the project to be constructed in accordance with specifications in the contract. The parties agreed "[s]team and electric generating equipment shall be housed in a steel and concrete structure with steel panel siding, as an extension to the present power plant structure" owned by CKP. The project was to be located on land to be sold by CKP to Sunflower for a nominal purchase price of $500.

The project was to be constructed so its net output could either be delivered into the transmission system of CKP and operated in parallel with other power production facilities or the unit could be operated by the cooperative separately from CKP's power station. The cost of the project was $5,675,000. CKP was to be in complete control of the planning and construction of the plant, subject to the rights of the parties under the contract. The contract provided:

". . . [I]t being agreed that the Project shall be operated by the Company [CKP] as an integral part of the Company's generating and transmission system during the term of this contract."

During the initial 40 year term of the contract CKP is to operate, maintain and furnish replacement for the project. It is to pay all expenses and "taxes of any kind or character that may now or hereafter be chargeable to the Cooperative because of its ownership of the Project". It is to pay all premiums for liability, for fire and

extended coverage on the plant and equipment and for owner's protective liability insurance. CKP is obligated to pay the cooperative "rent in an amount equal to the interest on and principal of the Cooperative's indebtedness to the United States . . . until such time as such indebtedness shall have been paid in full." In addition $400 per month is to be paid for the cooperative's administrative and related expenses, commencing with the date of operations. The contract further provides:

"Section 3. Disposition of Project Output. All of the electric power and energy produced by the Project shall belong to the Company [CKP] to be used and distributed by it as it may determine, subject to the provisions of Article III hereof, and Section 1 of Article IV hereof."

Under Article III CKP agrees to sell and the cooperative agrees to purchase "all of the electric power and energy which the Cooperative shall require during the term of this contract up to a maximum demand of 18,700 KW. This maximum demand may, at the option of the Cooperative, be increased to 22,000 KW." In this regard the contract specifically provides:

"For the purpose of calculations hereunder, it shall be understood that the Cooperatives maximum demand shall be the arithmetical sum of the non-coincidental monthly billing demands of the various Member Cooperatives at their respective delivery points, it being assumed for purposes of this contract that diversity factors offset transmission losses."

The electric energy to be received by the cooperative hereunder is to be delivered by CKP to thirty (30) specified delivery points in communities served by CKP. These diverse points of delivery include the communities of St. Francis, Phillips County, Goodland, Wallace and WaKeeney which are scattered in the service area of CKP.

The term of the contract is for a term of 40 years or until the rental payments equal the interest on and principal of the cooperative's indebtedness to the United States in respect to the project. The contract further provides it will continue "thereafter from year to year unless terminated by either party's giving notice of termination in writing". The rights of CKP on termination are provided as follows:

". . . Upon such termination of this contract the Company [CKP] shall have and is hereby given the right and privilege to remove the Project or any part thereof at the Company's expense.

"Upon such termination the Cooperative shall convey to the Company the tract of land herein designated as the plant site and all improvements thereon by warranty deed . . . upon payment by the Company to the Cooperative of the amount of Five Hundred Dollars ($500)."

The parties have continued under this contract without interruption during the past 19 years. Approximately 21 years remain on the initial term of the contract. We are informed on oral argument that this application for general rate increase is the first since the construction of the Ross Beach No. 2 plant. So the method adopted by the KCC staff of including the Ross Beach No. 2 plant as an integral part of the system, rather than segregating it and assigning it to federal jurisdictional customers, does not indicate any change in treatment by KCC.

CKP in its brief on appeal narrows and defines the primary issue which confronts us in this case as follows:

". . . Here no question exists regarding the sufficiency of the evidence to support any Commission finding of the basic facts. There is no question of the credibility of any witness, or of any need to 'weigh the evidence'. The facts are not in dispute. It has been established without dispute that the Sunflower Plant is owned by Sunflower, that it was constructed with a low-cost, 2% interest REA loan, that it is the largest and most economical generating plant operated by CKP, and that the peak electric demands of Sunflower have for many years exceeded the generating capacity of this plant.

"The only question is whether the costs and economic benefits of the Sunflower Plant should be directly assigned to Sunflower, or shared by the other (retail) customers of CKP by rolling-in or pooling the costs of the Sunflower Plant together with the costs of CKP's other production facilities. The Commission determined that the costs of the Sunflower Plant should be rolled-in or pooled with those of CKP's other facilities, and its benefits shared proportionately by all of CKP's customers. . . ."

We must remain mindful that the corporation commission has been vested by the legislature with wide discretion (*General Communication System, Inc. v. State Corporation Commission,* 216 Kan. 410, 418, 532 P. 2d 1341) and the commission's findings have a presumption of validity on review. (*Class 1 Rail Carriers v. State Corporation Commission,* 191 Kan. 201, 207, 380 P. 2d 396.) The scope of judicial review of an order of the corporation commission is set forth in K. S. A. 66-118d and such review is limited to a determination of the lawfulness and reasonableness of the order. An order is lawful if it is within the statutory authority of the commission and if the prescribed statutory and procedural rules are followed in making the order; it is generally considered reasonable when based upon substantial competent evidence. (*Kansas-Nebraska Natural Gas Co. v. Corporation Commission,* supra.) The power and scope of judicial review provided in K. S. A. 66-118d does not give the courts authority to substitute their judgment for that of the commission. It is only when the commission's determina-

tion is so wide of the mark as to be outside the realm of fair debate that a court can nullify it. (*Graves Truck Line, Inc. v. State Corporation Commission,* 215 Kan. 565, Syl. 5, 527 P. 2d 1065.)

The parties do not cite any cases in which a court has considered the reasonableness of commission action in refusing to separate a base generating plant being operated under a contract similar to the one in this case. We have little doubt a separation of facilities may be a proper step in determining the cost allocable to the various classes of services rendered by a utility. Likewise, an integration of facilities owned by separate entities, but operated by a single utility, may be a step in determining the cost properly allocable to the various classes of service rendered by the utility. The method to be used by the corporation commission in allocating the cost of service between two classes of customers served by an electric generating utility must depend largely upon the facts and circumstances of each particular case.

In *Colorado Interstate Co. v. Comm'n.,* 324 U. S. 581, 89 L. Ed. 1206, 65 S. Ct. 829, the question of separation of properties was discussed. The pipeline there involved served three classes of customers. The Federal Power Commission had jurisdiction over only part of these services. In discussing the proper allocation of properties between different classes of services the court said:

". . . If Congress had prescribed a formula it would be the duty of the Commission to follow it. But we cannot say that under the Natural Gas Act the Commission can employ only one allocation formula and that that formula must entail a segregation of property. A separation of properties is merely a step in the determination of costs properly allocable to the various classes of services rendered by a utility. But where, as here, several classes of services have a common use of the same property, difficulties of separation are obvious. Allocation of costs is not a matter for the slide-rule. It involves judgment on a myriad of facts. It has no claim to an exact science. Hamilton, Cost as a Standard for Price, 4 Law & Cont. Prob. 321. But neither does the separation of properties which are not in fact separable because they function as an integrated whole. Mr. Justice Brandeis, speaking for the Court in *Groesbeck v. Duluth, S. S. & A. R. Co.,* 250 U. S. 607, 614-615, noted that 'it is much easier to reject .formulas presented as being misleading than to find one apparently adequate.' Under this Act the appropriateness of the formula employed by the Commission in a given case raises questions of fact, not of law." (324 U. S. pp. 589-590.)

On examining the statutes of Kansas we find no specific formula prescribed for rate proceedings which the KCC is directed to follow. So the same observations made in *Colorado Interstate* case would seem to be equally valid for proceedings before the state

commission. Later in the *Colorado Interstate* opinion the high court observed:

". . . [W]e are not convinced that the direct industrial sales were saddled with greater costs than they would have been had the laterals been segregated. The gravamen of this complaint is that the industrial sales are being burdened with costs of a part of the system which the direct industrial gas never uses. That contention points up our earlier observation that judgment and discretion control both the separation of property and the allocation of costs when it is sought to reduce to its component parts a business which functions as an integrated whole. . . ." (324 U. S. p. 591.)

In *Re Sierra Pacific Power Company*, 5 PUR4th 486, a proposal to adopt a rolled-in method of cost allocation and rate design for a cooperative subsidiary of a parent power company was rejected where the necessary connections did not exist to enable the parent to deliver power to the subsidiary before the completion of the subsidiary's direct connection with the parent. However, the case would indicate that rolled-in costs may be appropriate in setting rates for a physically integrated or interconnected system when all the power available to the system is used interchangeably to supply its requirements as a whole and thereby enhance the reliability and adequacy of service to each class of customer served.

Appellant and appellee both cite *Re Wisconsin Michigan Power Company*, 54 PUR3d 321, for our enlightenment. The case involves a parent-subsidiary relationship not present here. The two companies had distinct and separate service areas, their systems were not thoroughly integrated and the computation of the cost of service to wholesale customers could be made on a separate company basis without unusual technical problems. The case is not persuasive with regard to the position taken by either of the parties here. The case merely recognizes that the propriety of separation or the rolling-in of properties of separate companies depends upon the characteristics of the system or systems supplying the energy requirements of a particular class of customer.

A general guideline for valuation of utility property by the commission is contained in K. S. A. 66-128; however, this particular Kansas statute is not helpful here because the problem in the present case does not arise over the determination of the total value to be assigned to the entire system. The problem here is one of allocating a proper portion of the total value after it has been determined.

In public utility rate cases the proper method of allocation should recognize the value of the property devoted to a particular service

and should result in a rate base which will bring a just and reasonable return on the property used in furnishing that particular service. (See K. S. A. 66-113.)

The commission employed Elmer Fox & Company, an accounting firm of Wichita, Kansas, to conduct the necessary investigation of applicant's (CKP's) records and inform the commission on the issues to be determined on the application. (See K. S. A. 66-1501.) After becoming aware of the background facts set forth in this opinion and examining the applicant's records, the manager of the firm, a certified public accountant, prepared schedules for the commission which were used as a basis for reducing the requested increase to $460,978. The decrease in income requested occurred as a result of treating Ross Beach No. 2 plant as an integral part of applicant's entire electric system.

Mr. Auten, a partner in Arthur Young & Company, a firm of public accountants, testified in support of the application filed by CKP. He stated that in view of the contractual arrangements and the operating circumstances he considered it appropriate to divide the production plant between the Ross Beach No. 2 unit and the balance of the system. Since the REA cooperatives have contractual rights with respect to the Ross Beach No. 2 unit and since their maximum demand substantially exceeds the capacity of that plant he assigned the capacity costs of that plant to the cooperatives. Because the company has no investment in that plant but does pay a rental in lieu of that investment, he assigned the rental costs on that plant to the cooperatives. To the extent that the cooperatives' maximum demand plus their share of the system reserve requirements exceed the capacity of the Ross Beech No. 2 unit he allocated a portion of the other system production plant investment to the cooperatives in the ratio of their demand in excess of the Ross Beach No. 2 capacity to the total system demand plus reserve requirements. The Kansas jurisdictional customers were allocated the remainder of the production plant investment.

At the conclusion of the rate proceeding the commission refused to adopt the method of allocation espoused by Mr. Auten. It adopted generally the method of allocation suggested by Mr. Moorman of Elmer Fox & Company. It set forth in its findings six reasons why it determined Ross Beach No. 2 plant should be treated as an integral part of CKP's entire system rather than separating and allocating it as a separate unit to the federal jurisdictional customer, Sunflower. The district court in reversing the order of the commis-

sion found each of these six reasons unreasonable. We will consider the six reasons later in this opinion.

The commission found that Ross Beach No. 2 plant should be allocated on the method which "most closely reflects the operating characteristics of that plant within the total system" and that the proposed adjustment "most nearly reflects the actual operation of applicant's system." In entering its final order the commission accepted certain suggested staff adjustments and rejected others. The rate of return was increased from 7.93% to 8.75%. (The applicant had used a rate of return of 8.76%.) The commission made certain changes in allocation ratios, increased operating expenses and made adjustments in projected income taxes.

Now let us turn back to the six reasons given by the commission for holding that the Ross Beach No. 2 plant should be treated as an integral part of CKP's entire system in allocating the total rate base between the two classes of service.

Reason 1. CKP essentially has all incidents of ownership in the Ross Beach No. 2 plant except legal title.

The district court found that the above statement was incorrect, not supported by evidence and not a valid reason for treating the Ross Beach No. 2 plant as an integral part of the system. The court stated that under the contract CKP owns only a leasehold interest with a remaining term of 22 years and that Sunflower is a bona fide owner of the plant subject to the leasehold interest. The court went on to say that Sunflower provided the lower cost financing and CKP was benefiting from the lower cost rental payments. If CKP had borrowed the money the fixed cost to the Kansas jurisdictional customers would have been higher and the rates for electricity would be higher. On appeal CKP supports this position and indicates that the commission disregarded the lease. It argues that it would be unreasonable not to assign the benefits of the Sunflower-financed plant to Sunflower, that neither CKP nor its retail customers could have obtained the REA loan and that the benefits of the low cost plant should be assigned to Sunflower for the benefit of its customers.

There is substantial appeal to this argument and the commission's statement that CKP essentially has *all* incidents of ownership would seem to be too broad. However, incidents of ownership in property generally include the right to its possession, use and the enjoyment of its products, in addition to legal title and the right to

sell or otherwise dispose of it. (73 C. J. S., Property, § 13, p. 192; 63 Am. Jur. 2d, Property, § 36, p. 321.)

The commission, no doubt, was considering the limitations placed on the property by the contract. Under this contract the Ross Beach No. 2 plant is to be constructed by CKP using REA funds in order to make electric energy available to Sunflower for the member cooperatives. The project is to be situated on land adjacent to the site of CKP's existing power station. The land was sold by CKP to Sunflower for a nominal sum of $500. The generating equipment is housed in an extension to an existing power plant structure of CKP in Hill City, Kansas.

The contract further provides that CKP is to take possession of the plant when constructed and operate it "as an integral part of the Company's generating and transmission system". CKP is to pay all taxes and insurance premiums. This would normally be the obligation of the owner-cooperative. The amount of rent to be paid covers the exact principal and interest on the REA loan, plus $400 to cover the cooperative's administrative expenses. Under the agreement all the electric energy produced belongs to CKP, not to Sunflower. Sunflower is assured of receiving 22,000 kilowatts of energy from CKP but that energy does not have to be generated by the Ross Beach No. 2 plant. The energy to be furnished is transmitted to various member cooperatives at 30 different delivery points which are in most cases closer to other base generating plants owned and being operated by CKP.

Another interesting provision of the contract concerns what is to be done at the end of the 40 year term when the contract expires. If the contract is then terminated Sunflower agrees to convey to CKP the tract of land designated as the plant site "and all improvements thereon" by warranty deed. CKP is to pay Sunflower $500 therefor. This amount equals the original cost of the land purchased by Sunflower from CKP before the plant was located thereon.

It should also be noted that the rates to be paid by Sunflower for the energy delivered by CKP are specified in a rate schedule which is attached to the contract. The contract provides if these rates shall be increased by any regulatory body having jurisdiction, Sunflower has the option on proper notice to take possession of the project. In such case all obligations of CKP under the contract shall cease and determine. Thereupon Sunflower is to pay all taxes, interest, principal and all insurance costs. In that event Sunflower

will be entitled to the entire output of the project. This provision of the contract has not come into play and Sunflower has not taken possession of the project nor is it entitled at this time to the output.

Considering the respective rights of CKP and Sunflower under this contract it does not appear that the commission's view of the incidents of ownership in the project was so wide of the mark as to be outside the realm of fair debate. The contract does include a sale arrangement. At the end of the 40 year term CKP might well become the purchaser of Ross Beach No. 2 plant on payment of a nominal sum, rather than to continue as lessee of the facilities involved. ( cf. *Kansas City Power & Light Co. v. McKay*, 115 F. Supp. 402. [D. D. C. 1953].)

Reason 2. Ross Beach No. 2 plant is one of the base load generating plants for the entire CKP system.

Reason 3. The summed peak demand of the RECs (the Sunflower member rural electric cooperatives) is substantially in excess of the monthly generating peaks of Ross Beach No. 2; therefore, the RECs are placing a substantial demand on the entire system because Ross Beach No. 2 is not capable of supplying the total demand of the RECs.

These two reasons for not separating the Ross Beach No. 2 plant from the CKP system appear to be interrelated and we will consider them together. The plant in question was one of three major electric generating plants being used by CKP. These base load plants are located at Hays, Hill City and Colby. Small generating plants are located at Hoxie, Atwood, Bird City and WaKeeney. The net capability of all of CKP's generating units is 87,000 kilowatts. The generating capability of the Ross Beach No. 2 plant is 22,000 kilowatts. The district court found that base load usage of this plant did not constitute an adequate reason to integrate it into the entire CKP system for rate making purposes. CKP in its brief on appeal agrees with the district court's assessment of the matter and points out that Sunflower's energy demands exceed the capability of this plant, that this plant is the largest plant in the system, that it operates more efficiently and that Sunflower should receive the benefits of the lower fixed costs by separating the plant and allocating it to federal jurisdictional service ( Sunflower ).

We note from an exhibit in the present record that the generated kilowatt peaks at the Ross Beach No. 2 plant are not pronounced and run somewhere near 22,000 kilowatts, the capacity of the plant. In comparison, the monthly peak demand of the member coopera-

tives receiving electrical energy from this CKP system runs somewhere near 23,000 kilowatts, but jumps to 31,000 kilowatts in the warmer months of June, July and August. It is readily apparent that during these warmer months almost one-third of the cooperative's demand load has to come from some generating source other than Ross Beach No. 2 plant.

The district court and CKP agree with the two basic statements set forth in Reasons No. 2 and 3 but state they are not reasons which justify a refusal to separate the Ross Beach No. 2 plant from the balance of the system. CKP's argument boils down to saying that the method of allocation used by CKP in its application is more reasonable than the method of allocation determined by the commission.

It appears that the commission did attach significance to the fact that Ross Beach No. 2 plant is a base load plant and that the sum peak demand of the member cooperatives is substantially in excess of the generating peaks of this particular plant, thus substantial demand load was placed on the generating capabilities of the balance of the system during the warmer summer months. We are not prepared to say that these are not proper considerations or that the commission acted unreasonably in considering these matters in arriving at its method of allocating the proper cost of service to the Kansas jurisdictional customers.

Reason 4. There is no direct relationship between the monthly or daily Kwh sales to the RECs (the Sunflower member rural electric cooperatives) and the net Kwh's generated at the Ross Beach No. 2 Plant.

Reason 5. The contractual agreement between CKP and Sunflower does not specify that energy must come from Ross Beach No. 2 Plant, but only that 18,700 Kw or 22,000 Kw under certain conditions will be available to the RECs from the total system.

Reason 6. The geographical location of Ross Beach No. 2 Plant does not allow that generating plant to serve all the RECs at each of the distribution points, because various switches are normally open.

The three foregoing reasons set forth by the commission are considered together by both the district court and CKP in its brief. CKP agrees, as factual statements, the reasons are correct but again it states these facts do not support a conclusion that the Ross Beach No. 2 plant should be considered an integrated part of the entire sytsem of CKP for rate making purposes. Weighing these plant

characteristics against Sunflower's part in obtaining the financing it argues the commission's order deprives Sunflower of the economic benefits of its own plant.

Again it appears to us that the judgment and discretion of the commission must control the method of allocating costs of a business which functions as an integrated whole and then seeks to separate a component part of that business in order to have it assigned for the benefit of a particular class of service. See *Colorado Interstate Co. v. Comm'n.,* supra. In *Southwestern Bell Tel. Co. v. State Corporation Commission,* supra, we held:

"A public utility has no vested right in any one particular formula or method, and the State Corporation Commission is not bound to use any particular formula, or combination of formulae, in valuing a public utility's property for rate making purposes. The State Corporation Commission should receive and consider all evidence which has a relevant bearing on reasonable value and then determine what formula, or combination of formulae, it believes should be used under the facts and circumstances of the case to arrive at a reasonable value of the property for rate making purposes." (192 Kan. 39, Syl. 3.)

Ross Beach No. 2 plant was operated in parallel with other power production facilities of CKP. The plant was physically integrated with the entire system and was interconnected. All generating plants functioned in a single system. All the power available to that system was used interchangeably to supply all energy demand requirements and thereby enhance the reliability and adequacy of service to all classes of customers served. These factors were properly considered by the commission in deciding on a proper method of allocating the cost of service received by Kansas jurisdictional customers.

Next we examine some additional matters set forth by CKP in its brief to support the judgment of the district court. CKP states that the commission must make findings of essential basic facts that support its decision so a reviewing court can perform its function and determine whether the commission's decision is reasonable. The statement is correct and finds support in many cases cited. However, CKP fails to point out how this principle of law applies to the findings of fact and conclusions of law, or lack of them, in this case. In reviewing the commission order the reasons set forth by the commission appear rational and logical and tend to support the ultimate decision reached. The commission determined, on the basis of all the facts surrounding the construction, operation and use of the Ross Beach No. 2 plant, that it was an integral part of

an entire system and should be treated as such in allocating the rate base between the different classes of customers served by the entire system. The commission was aware of and considered the argument of CKP on behalf of Sunflower that the costs and economic benefits of the plant should be assigned directly to Sunflower. However, when the contract for the construction and operation of the plant was entered into the parties agreed that the plant was to become an integral part of the CKP system. All electric energy produced and transmitted therefrom was to belong to CKP, not to Sunflower. Looking at the factual findings it does not appear that the commission acted in an arbitrary or unreasonable manner. It appears to us on judicial review that the commission did articulate a rational connection between the facts found and the choice of method of allocation.

CKP states that in a rate proceeding the commission must make a fair and reasonable determination of each element of the rate base, the rate of return and the operating expenses. Upon judicial review the court must then consider the evidence applicable to each such element to determine the reasonableness of the order. It argues that the commission failed in this duty and made a material error in allocating a just portion of the rate base to the Kansas jurisdictional customers.

In reviewing this position taken by CKP it appears there was no great dispute as to the fixed production cost of the entire system and nothing is said about the reasonableness of the 8.75% rate of return allowed. There appears only one difference of opinion and that is over the basis for the arithmetical determination of the allocation to Kansas jurisdictional and federal jurisdictional service, assuming it was proper to treat the system as an integrated whole. That difference occurred when the commission used non-coincident annual peak demand in its formula. Using non-coincident annual peak demand the commission allocated 67.80% to the Kansas jurisdictional service. If coincident demand had been used this would have resulted in a 71.78% allocation to Kansas jurisdictional service, assuming CKP is correct in its figures. Neither the district court nor CKP discussed the effect of using non-coincident annual peak demand as against coincident demand, or the reasoning behind such usages. We note that the parties provided in the contract that the maximum demand of the cooperatives shall be the arithmetical sum of the non-coincidental monthly billing demands of the various member cooperatives. We believe this is an area where the

expertise of the commission and its staff must be recognized. It is not a question to be determined by the courts on judicial review. The mere statement that it is unreasonable, without further support, does not make it so.

One final argument by CKP should be noted. The company filed an application which is now pending before the Federal Power Commission (FPC) requesting a rate increase sufficient to recover the costs which it allocated to Sunflower, its federal jurisdictional customer. The allocation method used in its application to FPC is the same method of allocation which it now urges. CKP points out that if the KCC order is approved by this court the federal jurisdictional rate base will be insufficient and a deficiency in annual income of $141,200 will occur. Accordingly, it will be denied the right to recover its total cost of federal jurisdictional service because of the resulting regulatory gap.

It would appear this unfair result should be avoided, if possible; however, the KCC in fixing rates for Kansas jurisdictional customer service cannot be controlled by what the FPC may or may not do in its rate proceeding. If the method of allocation adopted by KCC with respect to Kansas jurisdictional customer service is reasonable, and we believe it is, it cannot be rendered unreasonable by possible action of the FPC in regard to federal jurisdictional customer service. As previously pointed out this is the first general application for increase in income filed since the Ross Beach No. 2 plant was put on the line. The method of allocation adopted by KCC does not change a previously established practice. The KCC should not be required by this court to increase the cost of service to Kansas jurisdictional customers merely because the FPC may not allow CKP sufficient cost of service to federal jurisdictional customers. Since the application is still pending before the FPC it may be that an amendment of the FPC application should be filed.

In reversing the order of the district court we are not holding that the commission would have acted unreasonably had it adopted some other method; or that in all cases the method here adopted by the commission will be reasonable; or that if we had been the commission, we would have chosen the same method. We merely hold in this case that the method of allocation adopted by the commission was not shown to be unreasonable, and that the dis-

trict court went beyond the proper scope of its judicial review by substituting its judgment for that of the commission.

The judgment of the district court is reversed.

FATZER, C. J., SCHROEDER and MILLER, JJ., dissent from the foregoing opinion.