(602 P.2d 131)

No. 51,106

SOUTHWESTERN BELL TELEPHONE COMPANY, *Appellant,* v. THE STATE CORPORATION COMMISSION OF KANSAS, *et al., Appellee.*

Petition for review denied January 29, 1980.

Opinion filed November 9, 1979.

*Jerry G. Elliott,* of Foulston, Siefkin, Powers & Eberhardt, of Wichita, and *Lawrence A. Dimmitt,* of Southwestern Bell Telephone Company, of Topeka, for appellant.

*A. Rodman Johnson,* assistant general counsel, and *Brian J. Moline,* general counsel, for appellee.

Before FOTH, C.J., ABBOTT and PARKS, JJ.

ABBOTT, J.: The sole issue in this review of a rate application is the reasonableness of the Kansas Corporation Commission's disallowance for rate purposes of a portion of a payment by Southwestern Bell Telephone Company to its parent company, American Telephone and Telegraph Company, under a license contract.

The license contract, dated September 26, 1930, and amended April 26, 1963, provides for payments by Southwestern Bell to AT&T of an amount equal to 2½ percent of Southwestern Bell's annual gross earnings. These payments are in consideration for services provided to Southwestern Bell by AT&T. As described by Southwestern Bell's witnesses, these services fall under four principal categories:

1. Research and fundamental development in the field of telephony;

2. Advice and assistance to the operating companies in matters pertaining to efficient conduct of their business;

3. The right to use AT&T patents and protection from patent infringement suits; and

4. Advice and assistance in financial matters.

From 1948 to 1974, AT&T waived a portion of its fee and accepted one percent of Southwestern Bell's gross earnings in satisfaction thereof. Southwestern Bell contends that this resulted in substantial deficits to AT&T in that the one percent did not cover the cost of services it provided pursuant to the licensing contract. Beginning October 1, 1974, AT&T required the operating companies (of which Southwestern Bell is one) to pay an allocated share of the costs incurred by AT&T in providing the services, including a return on investment. Each company's allocated share, however, was not to exceed the contract rate of 2½ percent of gross revenues. Since 1974, Southwestern Bell's payments to AT&T under the license contract have increased an average of 23.06 percent per year. For the test year here involved (ending March 31, 1977), the Kansas intrastate portion of Southwestern Bell's payment was $3,582,543 (approximately 1.7 percent of revenues).

The Kansas Corporation Commission, for ratemaking purposes, limited Southwestern Bell's payment under the license contract to the traditional one percent of revenues ($2,062,000). The reasonableness of that limitation is the issue on review.

There appears to be little, if any, disagreement by the parties as to the standard of review applicable for cases of this nature. The standard was recently stated in *Midwest Gas Users Ass'n v. Kansas Corporation Commission,* 3 Kan. App. 2d 376, 380-81, 595 P.2d 735, *rev. denied* September 11, 1979, as follows:

"K.S.A. 1978 Supp. 66-118d limits judicial review of an order by the commission to determining whether the order is 'lawful' or 'reasonable.' *Kansas Gas & Electric Co. v. State Corporation Commission,* 218 Kan. 670, Syl. ¶ 1, 544 P.2d 1396 (1976). A court has no power to set aside such an order unless it finds that the commission acted unlawfully or unreasonably. *Jones v. Kansas Gas and Electric Co.,* 222 Kan. 390, 396-7, 565 P.2d 597 (1977). An order is 'lawful' if it is within the statutory authority of the commission, and if the prescribed statutory and procedural rules are followed in making the order. *Central Kansas Power Co. v. State Corporation Commission,* 221 Kan. 505, Syl. ¶ 1, 561 P.2d 779 (1977). An order is generally considered 'reasonable' if it is based on substantial competent evidence. *Jones v. Kansas Gas and Electric Co.,* 222 Kan. 390, Syl. ¶ 2.

"The legislature has vested the commission with wide discretion and its findings have a presumption of validity on review. *Central Kansas Power Co. v. State Corporation Commission,* 221 Kan. at 511. Since discretionary authority has been delegated to the commission, not to the courts, the power to review does not give the courts authority to substitute their judgment for that of the commission. *Central Kansas Power Co. v. State Corporation Commission,* 206 Kan. 670, 675, 482 P.2d 1 (1971). The commission's decisions involve the difficult problems of policy, accounting, economics and other special knowledge that go into fixing utility rates. It is aided by a staff of assistants with experience as statisticians, accountants and engineers, while courts have no comparable facilities for making the necessary determinations. *Southwestern Bell Tel. Co. v. State Corporation Commission,* 192 Kan. 39, 48-9, 386 P.2d 515 (1963). Hence a court may not set aside an order of the commission merely on the ground that it would have arrived at a different conclusion had it been the trier of fact. It is only when the commission's determination is so wide of the mark as to be outside the realm of fair debate that the court may nullify it. *Kansas-Nebraska Natural Gas Co. v. State Corporation Commission,* 217 Kan. 604, 617, 538 P.2d 702 (1975); *Graves Truck Line, Inc. v. State Corporation Commission,* 215 Kan. 565, Syl. ¶ 5, 527 P.2d 1065 (1974)."

In considering whether an order of the Commission is based on substantial competent evidence and thus reasonable, our Supreme Court has stated that substantial competent evidence is that which possesses something of substance and relevant consequence, and which furnishes a substantial basis of fact from which the issues tendered can reasonably be resolved. *Jones v. Kansas Gas and Electric Co.,* 222 Kan. 390, Syl. ¶ 3, 565 P.2d 597 (1977).

A brief description of the part of the Bell System that is involved in this rate hearing is useful. AT&T is comprised of the

long lines department, which operates the long distance network interconnecting the territories served by the operating companies and which provides foreign connections, and of the general department, which provides advice and assistance to the operating companies under the license contract agreement. Western Electric Company is a wholly owned subsidiary of AT&T and manufactures, purchases, repairs and distributes telecommunications apparatus used by the operating companies. Bell Telephone Laboratories is owned 50 percent by AT&T and 50 percent by Western Electric and conducts research, development and design work for the system. In turn, there are twenty-three operating companies that provide telephone service and facilities within their respective territories. Southwestern Bell is one of those companies and is a wholly owned subsidiary of AT&T.

In our analysis of this case, we start with the well-established principle that all rates fixed by the Commission are prima facie reasonable unless or until changed or modified by the Commission or by court order. K.S.A. 66-115. For several years the Commission has approved a license contract expense of one percent of revenues, the last such order being in 1977 (Docket No. 107,330-U, 19 Pub. U. Rep. 4th 1). Thus, the burden was on Southwestern Bell to show that the one percent level was no longer just or reasonable. Did Southwestern Bell meet its burden?

Southwestern Bell is a wholly owned subsidiary of AT&T. As such, payments under the license contract are subject to the provisions of K.S.A. 66-1403:

"In ascertaining the reasonableness of a rate or charge to be made by a public utility, no charge for services rendered by a holding or affiliated company, or charge for material or commodity furnished or purchased from a holding or affiliated company, shall be given consideration in determining a reasonable rate or charge unless there be a showing made by the utility affected by the rate or charge as to the actual cost to the holding or affiliated company furnishing such service and material or commodity. Such showing shall consist of an itemized statement furnished by the utility setting out in detail the various items, cost for services rendered and material or commodity furnished by the holding or affiliated company."

The purpose of this provision is to enable the Commission to determine whether a public utility's investment, rate base, or *operating expenses* have been inflated by charges by its affiliates, which include unreasonable profits to such affiliates, so that the Commission may disallow the unreasonable part of such charges,

if any, in determining the reasonableness of the public utility's rates. The statute requires only such character and amount of itemization and detail of the actual cost of commodities or services sold or furnished to the public utility by its affiliates as would be practicable and reasonable under the conditions and circumstances of the particular case involved. *Southwestern Bell Tel. Co. v. State Corporation Comm.,* 169 Kan. 457, Syl. ¶ 1, 219 P.2d 361 (1950). In that case, the Commission had refused to give any consideration to payments made by Southwestern Bell to AT&T and Western Electric because of a perceived lack of detail in the showing of the affiliate's actual costs. The Court held the showing to be sufficient for consideration and returned the matter to the Commission for a determination of the reasonableness of the payments.

In *Southwestern Bell Tel. Co. v. State Corporation Commission,* 192 Kan. 39, 386 P.2d 515 (1963), the Court stated at p. 83:

"The fact that transactions take place between affiliated Companies is a matter justifying close scrutiny, but the matter should not be given any consideration in the absence of evidence of unfair dealing.

"In *Southwestern Bell Tel. Co. v. State Corporation Comm.,* 169 Kan. 457, 219 P.2d 361, this court considered the proof necessary to establish the reasonableness of affiliated company transactions. Once the Company had established such proof, the Commission must abide by the results unless it wishes to introduce evidence to the contrary."

In the present case, Southwestern Bell takes the position that it has met its burden of showing that the one percent level was no longer just and reasonable simply by making the showing required by K.S.A. 66-1403. It argues that once the actual cost to AT&T of providing the services is shown, the reasonableness of Southwestern Bell's payments for those services must be presumed absent evidence of unfair dealings.

We do not agree. Making the showing required by K.S.A. 66-1403 is only the first step that a utility must take in meeting its burden for a change in rates based on increased expenses growing out of affiliate transactions. As we view K.S.A. 66-1403, *no* charge by a holding or affiliated company is to be given consideration in determining a reasonable rate *unless* there is a showing of actual cost to the holding or affiliated company of furnishing the service. *After* such a showing is made, the Commission has *still* to determine the reasonableness of the charge based on the evidence produced by the utility. The utility does *not* meet its burden of

showing the charge to be reasonable simply by showing the actual cost to the affiliate providing the service.

Such a reading is consistent with the purpose of K.S.A. 66-1403 as interpreted in *Southwestern Bell,* 169 Kan. 457, and is not altered by the statement, set out above, in *Southwestern Bell,* 192 Kan. at 83. The burden does not shift to the Commission *until* the utility makes a showing of the *reasonableness* of its expenses. In the present case, as in most, this requires more than simply showing the actual cost to the affiliate of providing the service expensed. The reasonableness of the expense to the utility, for ratemaking purposes, will depend, among other factors, on whether the services provided themselves are necessary or beneficial to Kansas ratepayers.

We will not attempt to summarize in detail the record before us, which consists of 3,631 pages of testimony, 93 exhibits, and a pleading file that is 3½ inches thick. It is necessary, however, to detail some of the testimony in order to have an understanding of this opinion.

Southwestern Bell presented the testimony of two major witnesses that is relevant to a consideration of the license contract agreement. Richard Maskiell, manager of license contract and regulatory matters in the comptroller's department of AT&T, was the sponsor of an extensive document admitted as exhibit 49. His testimony includes a description of the accounting methods by which separate accounts for each AT&T entity are segregated, a narrative of the internal procedures utilized in determining the cost of a service and the corresponding nature of such service, an explanation of the process by which costs are allocated among the various operating companies, and a description of the budgeting process. Despite this extensive documentation of alleged cost calculation, it is clear that the underlying computations and determinations are subjective decisions in part. Maskiell emphasized that the operating companies have extensive input into budget and program decisions; that the operating companies benefit from the centralization of services provided by AT&T and Bell Laboratories; that there is no duplication of services or costs provided to the operating companies; that the accounting system used by AT&T is sound under general accounting principles; and that there are many safeguards to insure that license contract expenses are reasonable and necessary. It is clear, however, that

the Commission was not impressed with the internal procedures which purportedly insure reasonableness of costs. The Commission specifically expressed its reservations of AT&T's license contract review committee (consisting of the presidents of three operating companies) and also expressed its doubts of "any cost-plus approach adopted by a parent company as a method of expensing funds from a subsidiary to the parent."

The bottom line of Maskiell's testimony is that AT&T was experiencing substantial deficits under the one percent agreement and that the "new" agreement, beginning in 1974, was an attempt to allocate total costs more effectively while allowing AT&T to recover the actual costs of its license services. Although the Commission staff made no specific rebuttal of any line item contained in Southwestern Bell's exhibit 49 that was presented and sponsored by Maskiell, it did attempt to show expenses were inflated by AT&T or not properly allocable by AT&T to the operating companies under the licensing contract in the area of charitable contributions, national advertising costs, quality assurance program costs, Bell Laboratories expenses, patent costs, picturephone services and costs, public relations and employee information costs, anti-trust expenses, and moving costs of AT&T's headquarters.

The next witness presented by Southwestern Bell was John Keith, assistant vice-president of business office services for Southwestern Bell and sponsor of a document admitted as exhibit 57. Keith's testimony focuses on the benefits derived from the agreement from the operating companies' point of view. Exhibit 57 contains the results of a study conducted under Keith's supervision. Its express purpose was "to attempt to quantify the monetary value of the benefits associated with the [license contract] services." The study was described as a continuing review process of the value of services received under the lease contract, as previous similar studies were conducted by Keith in 1975 and 1976. The data for the present study were primarily collected in the first five months of 1977. Expressing the view of the impracticability of assessing all four major areas of AT&T services supplied to the operating companies (advice and assistance, patent rights, financial assistance, and research and development), Keith's study focuses only on the advice and assistance phase. The study was conducted with the assistance of department

coordinators at Southwestern Bell who were supplied with instructions and forms to be utilized in identifying license contract services, the benefit derived by Southwestern Bell from such services, and a quantification of the costs incurred if Southwestern Bell were required to provide such services itself. The quantification method basically involved a determination of the number of employees required to provide the service, including a determination of the "level" of employee required and the amount of time each employee would allocate to such service, based on AT&T's employee classification system and a standardized "loaded" figure which added such factors as equipment and housing to the base salary figure. An example of the methodology used was admitted as exhibit 59. Additionally, the study included an assessment of allegedly necessary "one-time costs" which would be required to provide similar services.

The study identified 531 separate service items within the advice and assistance area. Keith testified his study concluded the license contract service provided by AT&T indicated a savings of $3,563,890 for the Kansas intrastate system, using the license contract allocation method, and that his study did not even include all benefits derived from the agreement in the advice and assistance category. The primary benefits derived from the advice and assistance portion of AT&T's license contract services, in Keith's opinion, were: (1) the value of not having to incur total costs in the event of providing similar services, and (2) the value of the advice and assistance provided. Keith's overall conclusion was that the costs of such services to Kansas are reasonable. Keith testified the Kansas area uses "almost all" of the advice and assistance services. Additionally, Keith concurred with Maskiell's assertion that the operating companies have substantial input into the nature and amount of services provided and that safeguards exist which insure the necessity of such services.

The Commission commented on the similarity of the present proceeding to the immediate preceding rate case and noted the alleged cost savings are *less* in the present case, according to Keith's study. The Commission concluded both the staff's computation of the cost of the study using Keith's figures and Keith's study were suspect and it was not accepted. The Commission appeared to disapprove Keith's inclusion of one-time costs in the test year which are incurred over a period of one to nine years.

The Commission also refers favorably to its prior decision (docket 107,330) in which Keith's study was criticized concerning the improper mixture of total company and intrastate comparisons, his lack of statistical expertise, and the inclusion of items outside the test year. Further, the Commission, in the prior proceeding, noted the inclusion of $302,000 in one-time costs for development of a new AT&T standard fire extinguisher, apparently finding such figure incredible. *Re Southwestern Bell Telephone Company,* 19 Pub. U. Rep. 4th at 23-24.

The Commission staff presented testimony by Darrell Bledsoe, a certified public accountant. Bledsoe criticized Keith's study for several reasons: (1) It improperly includes one-time costs which should be allocated over a longer period of time; (2) it fails to designate services not used in Kansas and specifically sets out programs which were not operational at the end of the test year; (3) it does not eliminate the possibilities of service duplication by the various AT&T entities and does not consider whether costs are properly allocated between the various AT&T entities; (4) it improperly categorizes services—Bledsoe lists four programs included in Keith's study of "advice and assistance" which Bledsoe believed should fall within a different category of service; (5) it fails to contemplate possible savings which could be realized if Southwestern Bell would provide certain services currently falling within the license contract; (6) Southwestern Bell failed to quantify incremental services rendered to Kansas if the license contract fee is at allocated cost rather than the one-percent figure. Bledsoe proposed retaining the figure of one percent previously approved. He advanced two primary arguments supporting the proposal: (1) The one percent fee allows the Commission to retain a degree of control over AT&T's revenues; and (2) a thorough cost study, akin to the California report, is impractical. Bledsoe testified in part that:

"Under the new method of determining the license fee payments, AT&T can undertake any project that they desire and charge all of the costs for these projects back down to the operating companies and ultimately to the jurisdictional ratepayers. Without a complete investigation of the costs included in test year expenses, a determination of benefits to jurisdictional ratepayers is impossible. We have been advised by the Director of Utilities that this is not practical. An alternative to such an investigation is an adjustment limiting the license fee to 1% of net revenues. Under the allocated cost method, AT&T does not have jurisdictional restrictions on what they can charge to the individual operating companies. The growth in customers and customer usage as well as tariff increases granted by

this Commission in the past years had the effect of increasing the license fee payments from Southwestern Bell Telephone to AT&T. The 1% of net revenues permitted yearly increases in the license fees paid to AT&T and also resulted in some element of control by this Commission as to the amount of such license fee that was paid by jurisdictional ratepayers."

Considerable discussion was evoked during Bledsoe's cross-examination regarding the "impracticability" argument of conducting a full study of the license contract expenses. Bledsoe admitted such a study was *possible,* but maintained its impracticability. He stated that the one-percent figure he recommended was chosen because "AT&T had utilized the one percent for 26 years, [and] that is the sole reason for choosing the one percent." Bledsoe's testimony is not specifically mentioned in the Commission's order.

The staff also presented the testimony of three witnesses concerning the California study of Pacific Telephone & Telegraph Company admitted as exhibit 50. James Pretti, principal financial examiner in the finance division of the California Public Utilities Commission, was responsible for the overall coordination of the audit and preparation of the report. Pretti noted the study took approximately three man-years to complete and that the staff held many interviews with AT&T and Bell Laboratories personnel as well as having audited both entities. A review of the work performed and expenses incurred by Bell Laboratories was deemed necessary in view of the fact that approximately 40 percent of license contract expenses originated there. Pretti identified the two major conclusions reached as a result of the study, testifying:

"1. A significant portion of the BTL charges which are billed to Bell operating telephone companies as part of the License Contract is for work which is related to and is in fact vital to the development of products manufactured by Western Electric Company. It is the Finance Division's opinion and recommendation that these costs be charged to Western Electric and not to the operating telephone companies as part of the License Contract.

"2. AT&T is the principal, if not sole, stockholder in Bell System companies, and as such, incurs certain expenses which are related to and primarily are for the benefit of its investors rather than the ratepayers of Bell System operating telephone companies. The General Departments of AT&T also engage in certain marketing and engineering activities which are related to products manufactured by Western Electric. The staff has recommended that investor related expenses not be allowed for rate making purposes and that product related expenses be charged to Western Electric rather than to operating telephone companies as part of the License Contract."

Pretti noted the similarity of Pacific Telephone & Telegraph Company to Southwestern Bell and conceded that Pacific Telephone is 90 percent owned by AT&T and 10 percent by the public, and that the capital structure of Pacific Telephone rather than AT&T is used in computing Pacific Telephone's rate of return.

Thomas O'Rourke, a California Public Utilities Commission financial examiner who assisted in preparing exhibit 50, testified about certain expenses of AT&T's general department which should not, in his opinion, have been included as a part of Pacific Telephone's fee under the license contract.

Thomas O'Rourke also prepared the Kansas analogue to the California report that was admitted as exhibit 66 and is purported to set out the Kansas intrastate allocated expenses for the test year based on data obtained from Southwestern Bell and AT&T. It suggested disallowance of $722,861 from the expenses of AT&T allocated to Southwestern Bell, although some $372,723 of that sum is related to California policy. O'Rourke testified he would suggest disallowance irrespective of such policies.

The final witness concerning the California report was Lloyd Humphrey, California Public Utilities Commission financial examiner who helped to prepare exhibit 50, specifically that portion dealing with allocation of Bell Laboratories expenses between AT&T and Western Electric. Humphrey's conclusion was that 70.6 percent of all charges for research and development conducted by Bell Laboratories and funded by the operating companies are *product related* and should be funded by Western Electric and thus excluded under the license contract.

The Commission in its order expressly denied adopting the California study exhibits as the sole reason for supporting the one percent limitation. Southwestern Bell points out a number of evidentiary questions concerning the report. We are of the opinion they go to the weight to be given the evidence and not to its admissibility. It further noted that the first full calendar year (1975) of cost plus billing to Southwestern Bell showed an increase of 75 percent from $2,292,350 (1973) to $4,016,239. In addition, the Commission also took note of its earlier order (*Re Southwestern Bell Telephone Company*, 19 Pub. U. Rep. 4th at 22-24) in which it discounted an audit of the license review committee, stating that the firm that conducted the audit did not

test the reasonableness of expenditures for ratemaking purposes. The auditors again testified in this case that they made no determination of the need or reasonableness of the expenditures.

Although Southwestern Bell appears to have met the requirement of K.S.A. 66-1403, *i.e.,* made a showing of the actual cost to AT&T of providing services under the license contract, we cannot say that the Commission erred in finding that it had failed in its further burden of showing the full amount of the payments to be reasonable. As such, Southwestern Bell failed to meet its burden of showing that the one-percent figure previously allowed, and which was cloaked in a presumption of validity, was no longer just or reasonable.

Southwestern Bell would like more explicit guidelines regarding its burden of proof. We can only state it has a burden to meet, much as it would have in a civil suit, and we can add little, if anything, to the established guidelines. The Supreme Court has previously upheld the finding of a trial court that K.S.A. 66-1403 requires a utility to furnish "only such character and amount of itemization and detail as would be practicable and reasonable in the circumstances of the particular case, having regard to the purpose the statute was intended to serve." *Southwestern Bell Tel. Co. v. State Corporation Comm.,* 169 Kan. at 473, 474. Southwestern Bell may not meet its burden merely by presenting testimony that the charges are reasonable; and, on the other extreme, it need not prove each item. Its burden of proof is somewhere in between and is met when the trier of fact (Kansas Corporation Commission) is convinced of the reasonableness of the proposed changes. The Commission may not arbitrarily disregard or reject evidence. Based on our examination of the record, we cannot say the Commission did so. Nor may the Commission establish an *arbitrary* percentage figure for the license fee contract. The one-percent figure that Southwestern Bell was allowed was cloaked in a presumption of validity and reasonableness and it was incumbent upon Southwestern Bell to prove the reasonableness of a change. We cannot say from the record that the Commission was in error in determining that Southwestern Bell failed to meet that burden. The record does not so strongly demonstrate that the services performed benefit Kansas ratepayers to the extent the increased fee imposed by AT&T would

require an increase in the rates. Thus, we are unable to say that under the circumstances the Commission's order is unreasonable. Affirmed.